## INDUSTRIAL BANKERS SECURITIES CORPORATION v. HIGGINS, Collector of Internal Revenue.

### No. 244.

Circuit Court of Appeals, Second Circuit.

May 8, 1939.

178

Lamar Hardy, U. S. Atty., of New York City (William L. Lynch and William F. Young, Asst. U. S. Attys., both of New York City, of counsel), for appellant.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City, and J. N. Welch and L. E. Green, both of Boston, Mass. (Robert C. Vincent, of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal by the defendant, Collector of Internal Revenue, from two judgments recovered by the plaintiff against him for $138,490.17 and $51,421.98 respectively, together with interest and costs. The judgments were based on claims of the plaintiff, Industrial Bankers Securities Corporation, for income taxes alleged to have been overassessed against it for the years ending September 30, 1932, and September 30, 1933. We think that the judgments were right and should be affirmed.

The plaintiff, a Delaware corporation, was organized on November 7, 1926, for the purpose of acquiring all of the stock of four corporations, of which one Noteman was then the sole owner, subject to an interest he had given to his wife, and of managing, financing and directing the business of the four corporations as wholly owned subsidiaries. Upon the organization of the plaintiff all of the stock of the subsidiaries was transferred to it and in consideration of such transfers $515,000 of the plaintiff's common stock was issued to Mr. Noteman for his interest, and $100,000 of the preferred stock was issued to Mrs. Noteman for her interest in the stocks transferred. He thus became the sole owner of all the common

stock issued by the plaintiff and, as such, exercised his power to direct and control its business. The plaintiff, as thus controlled, proceeded to direct and control, as well as to finance, the business of its subsidiaries, as Mr. Noteman had previously done as an individual. The number of subsidiary corporations increased from four to eight by 1932 and one more subsidiary was added in 1936. Their business was a socalled small loan business carried on pursuant to provisions of the "Uniform Small Loan Law" under the statutes of Pennsylvania, Massachusetts and New York where the various subsidiaries were operated.

From the time the plaintiff was organized the small loan business continued to grow and as a result more money was constantly needed to finance the subsidiaries so that they might make desirable loans. Efforts on the part of the plaintiff to sell additional stock and to market long term securities in order to procure funds that might be furnished to the subsidiaries did not result in sufficient new capital to meet their needs. While it had been able to borrow money from banks and from Mr. Noteman, as its business increased, a less expensive and more advantageous method of financing the subsidiaries was to accumulate a large part of such dividends as were paid to it by its subsidiaries and to make loans to them out of that surplus without interest.

The principal development and growth of the business of the plaintiff and its subsidiaries resulted from plowing back into that business surplus earnings that were not required to pay the dividends declared to its stockholders. Dividends of either 10% or 11% were paid on the preferred stock (the maximum to which that stock was entitled) and of 6% or 7% were paid on the common stock. The surplus earnings accumulated by the plaintiff were made available to the subsidiary companies through loans in such amounts and in such proportions as the plaintiff, which through stock ownership was in control of those companies, deemed advantageous to the operating units.

In 1931 the financial depression began to affect the small loan business of the subsidiaries. In the spring of that year the loans receivable by them were about $1,400,000, on September 30, 1932 they had dropped to about $1,000,000 and on September 30, 1933 to about $840,000. This was due to a business policy which forbade loans to persons who were unemployed. The depression was also accompanied by a drop in the net earnings of the subsidiaries from $276,494 for the year ending September 30, 1931, to $207,000 for the year ending September, 1932, and to $122,000 for the year ending September, 1933.

With a surplus accumulating in the hands of the subsidiaries because of the repayment to them of their small loans and with the general contraction of the business, the question arose as to whether this surplus should be paid out by the subsidiaries in dividends to the parent corporation and held by the latter to await the needs of a normally growing business or should be retained by the subsidiaries for the same purpose. Mr. Noteman, who was the directing head of the enterprise, believed that the depression was bound to end before a great while and that the surplus would then be required to meet the needs of the business. But he was not satisfied to have the funds lying idle pending an anticipated recovery and thought that if they were temporarily invested in common stocks at the low market prices then current an advantageous profit would be realized. Consequently he caused the subsidiaries to declare dividends from the surplus, caused the plaintiff to pay off its bank loans and to invest amounts not needed for dividends on its own stock in common stocks which it purchased between October, 1931, and the spring of 1933 at a cost of $530,841.99. These stocks were all sold by July, 1935, at a profit of $350,000.

The business of the subsidiary (or operating) companies revived after September 30, 1933 so that the loans receivable by September 30, 1934 became $1,321,277, by September 30, 1935 $2,052,405, by September 30, 1936 $2,557,038 and by September 30, 1937, $3,339,157. During the period preceding the final sale of the stock holdings Noteman thought that it was unwise to sell the securities faster than they were actually liquidated for he could obtain bank loans at only about 4% per annum. He, therefore, arranged extra financing of the operating companies through bank loans instead of by selling the stocks in which the surplus was invested during the time when it was thought inadvisable to liquidate them completely.

The Commissioner of Internal Revenue held that the plaintiff had been availed of to permit unlawful accumulations of surplus to prevent the imposition of surtaxes in the years 1932 and 1933 upon its single common stock holder Noteman. Accordingly deficiencies were assessed against the plaintiff for both years under Section 104 of the Revenue Act of 1932, 47 Stat. 195, 26 U.S.C.A. § 104 note. The portions of Section 104 under which the Commissioner assessed the deficiencies were the following:

*"Accumulation Of Surplus To Evade Surtaxes.*

"(a) If any corporation however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed, there shall be levied, collected, and paid for each taxable year upon the net income of such corporation a tax equal to 50 per centum of the amount thereof, which shall be in addition to the tax imposed by section 13 and shall be computed, collected, and paid upon the same basis and in the same manner and subject to the same provisions of law, including penalties, as that tax.

"(b) The fact that any corporation is a mere holding or investment company, or that the gains or profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to escape the surtax. * * *"

After payment by the plaintiff of the alleged over-assessments the latter sought recovery in the two actions and obtained the judgments in its favor which are now on appeal. The facts were reported substantially as they have been summarized in this opinion by an auditor appointed by the District Court in both actions. The auditor was ordered "to define and simplify the issues * * * to take and report testimony, to audit and state accounts, to make computations and findings on conflicting evidence * * *". In granting the applications of the plaintiff to appoint an auditor the judge adopted the practice sanctioned by the Supreme Court in Re Peterson, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919, and provided for by Rule 26 of the United States District Court for the Southern District of New York reading as follows:

"26. Auditors.

"In any Bankruptcy proceeding where the issue of insolvency is to be tried and in causes at Common Law, where accounts are complex and intricate, or the documents and other evidence voluminous, or where extensive computations are to be made, the Court may appoint an auditor to define and simplify the issues, to take and report testimony, to audit and state accounts, to make computations, to make findings on conflicting evidence and to make and file a report in the office of the Clerk, which report shall not finally determine the issue but shall, unless excepted to within ten days after the service of notice of filing and rejected by the Court, be admitted at the trial before the jury as prima facie evidence of the evidentiary facts and of the conclusions of fact therein set forth (Ex Parte Peterson, 253 U.S. 300 [40 S.Ct. 543, 64 L.Ed. 919])."

The auditor, after reporting the facts as we have related them, tabulated the amounts borrowed by the taxpayer at the end of each fiscal year (to wit: September 30) after the year 1933 thus:

| | |
|---|---|
| 1934 | $ 200,000 |
| 1935 | 439,000 |
| 1936 | 817,350 |
| 1937 | 1,372,000 |

He also reported that on December 30, 1931, the taxpayer declared a stock dividend of $285,000 and at the end of December, 1934, declared a stock dividend of $200,000, thus increasing the capital represented by its common stock to $1,000,000—the total which it was authorized to issue under its certificate of incorporation. The effect of this was to take $485,000 from surplus that would otherwise have been available for the payment of cash dividends. It is clear from the steady increase of borrowings after the stock investments were sold that the retention of the surplus and the increase of the capital were reasonably needed to finance the operating subsidiaries.

The auditor also stated the following as conclusions of fact:

### "Conclusions

"The foregoing facts are those disclosed by the evidence and are the facts in the light of which the final issues of fact between the parties remain to be found.

"(26) The first issue presented is whether the plaintiff is shown to be 'a mere holding or investment company'. The defendant maintains that it is shown to be a mere holding company, but says that the question is one of law and that it is, therefore, not within my power as auditor to make a finding thereon. In view, however, of the decision in Commissioner v. Cecil B. DeMille, 9 Cir., 90 F.2d 12, and of the opinion in United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867, the question would seem to be one of fact, and I accordingly take it to be my duty to make a finding thereon.

"In circulars issued in connection with its efforts to sell preferred stock, the plaintiff described itself as 'a holding corporation' and stated that its 'main business' was 'to own and control duly incorporated and licensed companies' in the business of making small loans. Whether the plaintiff was a holding company, however, is not the test. It concedes that, but, nevertheless, maintains that it is not a 'mere' holding company, and it is the validity of that contention that is to be determined. In the exercise of its 'control' of the subsidiaries, the plaintiff did so much more than a company would be bound to do or would ordinarily do as a holding company pure and simple—its actual control of the business was so perfect and complete—that I have no hesitation in finding that the plaintiff is right in its contention. The word 'mere' cannot be taken from the statute, it must be given its commonly understood meaning, and I accordingly find that plaintiff was not a mere holding or investment company.

"(27) The second issue presented is whether the 'gains or profits' accumulated by the plaintiff in its fiscal years ending September 30, 1932 and September 30, 1933, when the business was affected by the depression, were 'beyond the reasonable needs of the business'. The question is answered by the nature and character of the business and its rapid growth both prior and subsequent to those years. I am satisfied that when the business fell off because of the depression, and the entire surplus was no longer required for its immediate needs, it was reasonable to suppose that the business would recover as soon as the depression ended and would continue to grow rapidly after that time;

and I am satisfied that Mr. Noteman's opinion that such surplus as could be accumulated in the meantime would be required for use in the business when the turn came was reasonably held. When the turn did come the gains and profits which had been accumulated were required by the business and thus had not been accumulated beyond the future needs thereof, as such needs had been reasonably anticipated. I accordingly find that the plaintiff did not, during the fiscal year ending September 30, 1932, or during the fiscal year ending September 30, 1933, permit its gains or profits to accumulate beyond the reasonable needs of the business.

"(28) The final issue, to be determined in the light of all the evidence, is with respect to the 'purpose' which the plaintiff sought to accomplish by permitting its gains or profits to accumulate. There is no other question. Mr. Noteman's right to incorporate his business and manage it through a corporation as an entity separate and distinct from himself, is assumed, and the only question is whether he availed himself of the corporation 'for the purpose' of escaping the surtax. I am satisfied that he did not and that his purpose throughout was to extend the business of the plaintiff and build up a permanent independent organization fit to compete with the larger and more powerful organizations in the same business; and I am satisfied that his management of the plaintiff was what it would have been had there been no surtax to escape.

"I accordingly find that the plaintiff corporation was not availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains or profits to accumulate, instead of being divided or distributed, during the fiscal year ending September 30, 1932, or during the fiscal year ending September 30, 1933. * * *"

The first point raised by the appellant is that the case is not one in which an auditor should have been appointed. In support of this position it is argued that the issue was one of intent to avoid the imposition of surtaxes and that the trial was not likely to involve "complex and intricate" accounts, or "extensive computations", or voluminous "documents and other evidence." The complaint in each action set forth the history of the business, which we have summarized above,

alleged that the plaintiff was neither formed nor availed of for the purpose of preventing the imposition of surtaxes on its shareholders by accumulating its gains and profits rather than distributing them, also alleged that it had never been a mere holding or investing company but from the beginning had for its principal business the operating and financing of small loan companies which were wholly owned subsidiaries, and that it had not accumulated its gains and profits beyond the reasonable needs of the business. These allegations were all denied in the answers.

Under the pleadings the district court might have been compelled to go into all the books and records of the plaintiff in order to have extensive computations available for presentation to a jury. Proof of the history and development of the business of the plaintiff and its numerous subsidiaries would certainly be relevant (Helvering v. National Grocery Co., 304 U.S. 282, 291, 58 S.Ct. 932, 82 L.Ed. 1346; United Business Corporation v. Commissioner, 2 Cir., 62 F.2d 754) and was in fact presented to the auditor. In such circumstances the appointment of an auditor was clearly proper, both under the Massachusetts decisions from which the auditor practice has been principally derived (Holmes v. Hunt, 122 Mass. 505, 23 Am.Rep. 381) and under the decisions of the United States Courts in Ex parte Peterson, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919; Graffis v. Woodward, 7 Cir., 96 F.2d 329; Irving Trust Company v. Trust Company of New Jersey, 2 Cir., 75 F.2d 280; Veneri v. Draper, 4 Cir., 22 F.2d 33; Fenno v. Primrose, 1 Cir., 119 801. Not only was the appointment of an auditor proper if we consider the situation facing the trial judge and the complexity of the evidence likely to be presented at the trial, but the proof before the auditor demonstrated the correctness of the judicial forecast for it involved consideration of balance sheets, statistics and the history over a period of many years of the numerous corporations involved in the litigation—material that would have been difficult for the trial judge to summarize for submission to a jury without the aid of a careful preliminary report.

 The next objection related to the scope of the report. It is argued that it amounted to a decision of the case in favor of the plaintiff and was not a proper document for submission to a jury. The so-called "Conclusions" which we have quoted at length are particularly criticised in this respect.

In the Massachusetts courts it has long been the custom to permit findings not only of subsidiary data upon which conclusions of fact may be based but also of all ultimate conclusions of fact required for a determination of the issues. Holmes v. Hunt, 122 Mass. 505, 515, 516, 23 Am. Rep. 381; Inhabitants of Wakefield v. American Surety Co., 209 Mass. 173, 95 N.E. 350. This practice seems to have been approved in Ex parte Peterson, 253 U.S. at page 307, 40 S.Ct. at page 545, 64 L.Ed. 919, where Justice Brandeis said: "It may be assumed that, if accepted by the court, the report would be admitted at the trial before the jury as prima facie evidence both of the evidentiary facts and of the conclusions of fact therein set forth. The report, being evidence sufficient to satisfy the burden of proof (Wyman v. Whicher, 179 Mass. 276, 60 N.E. 612), would tend to dispense with the introduction at the trial before the jury of evidence on any matter not actually in dispute. The appointment of the auditor would thus serve to shorten the jury trial, by reducing both the number of facts to be established by evidence and the number of questions in controversy. A more intelligent consideration of the issues submitted to the jury for final determination would result."

The decisions as to the scope of findings by the Interstate Commerce Commission under section 16 of the Act to Regulate Commerce, 49 U.S.C.A. § 16, are to the same effect. Mills v. Lehigh Valley R., 238 U.S. 473, 477, 35 S.Ct. 888, 59 L.Ed. 1414; Meeker v. Lehigh Valley R., 236 U.S. 412, 427, 35 S.Ct. 328, 59 L.Ed. 644, Ann.Cas.1916B, 691.

The importance of the report and indeed its finality in the present case need not be determined by the question whether the "Conclusions" of the auditor were properly admissible. The prior findings in the report were quite enough to support the causes of action on trial and to justify the direction of the verdict for the plaintiff. There were no findings in the report which contradicted either the other findings supporting the allegations of the complaint or the general conclusions of fact reached by the auditor. The only evidence introduced at the trial by the government to meet the report was the testimony of two revenue agents who said nothing tending to contradict the

auditor's findings. As a result, both under Rule 26 of the District Court and under the decision in Ex parte Peterson, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919, the report stood as "prima facie evidence both of the evidentiary facts and of the conclusions of fact therein set forth." From the evidence admitted at the trial, namely, the report of the auditor and the testimony of the defendant's witnesses, only one inference could be drawn. Therefore, there was no question to be submitted to the jury and the verdicts for the plaintiff were properly directed. Inhabitants of Wakefield v. American Surety Co., 209 Mass. 173, 95 N.E. 350; Atlantic Coast Line R. Co. v. Smith Bros., 5 Cir., 63 F.2d 747, certiorari denied, Texas & P. R. Co. v. Smith Bros., 289 U.S. 761, 53 S.Ct. 795, 77 L.Ed. 1504.

The last objection of the appellant is to the amount of compensation allowed the auditor. This was fixed by the District Court after a notice setting forth the amount of compensation asked had been given to the District Attorney who, on the return of the motion, made no objection to such amount, which was thereupon allowed by the court. The report contained a clear and comprehensive delineation of the business of the plaintiff and its subsidiaries and dealt with numerous difficult questions. It manifestly required a large amount of time and labor and the protracted study of an experienced lawyer. It clarified the issues, disposed of refunding claims amounting, with interest, to over $220,000, and greatly shortened the time that would otherwise have been consumed in a jury trial. We see no reason for interfering with the exercise of discretion on the part of the District Court in fixing the compensation.

Judgments affirmed.