## WARNER COAL CORPORATION v. COSTANZO TRANSP. CO. et al.

### No. 5253.

Circuit Court of Appeals, Fourth Circuit.

Aug. 4, 1944.

James A. Butler, of Cleveland, Ohio, and Howard D. Matthews, of Wheeling, W. Va. (G. Alan Garden and Lester C. Hess, both of Wheeling, W. Va., Bulkley, Butler & Pillen, of Cleveland, Ohio, and Handlan, Garden, Matthews & Hess, of Wheeling, W. Va., on the brief), for appellant.

R. G. Jeter, of Akron, Ohio, and Melvin W. Kahle, of Wheeling, W. Va. (Austin V. Wood and George A. Blackford, both of Wheeling, W. Va., on the brief), for appellees.

Before PARKER, SOPER, and NORTHCOTT, Circuit Judges.

SOPER, Circuit Judge.

This appeal is taken from a judgment whereby the Warner Coal Company, a West Virginia corporation, the lessee of two coal mines on the Ohio River in the panhandle area of the State, was adjudged a bankrupt on February 10, 1944. It is contended that the judgment should be re-

versed because (1) the judge erroneously excluded from the consideration of the jury certain evidence as to the value of the property of the Coal Company which would have shown that the Company was not insolvent when the alleged act of bankruptcy was committed; (2) there was collusion, amounting to fraud, between the petitioning creditors and the lessors of the mine; and (3) the mines had been taken over by the United States government before the suit was filed.

Prior to the fall of 1942 the mines were owned and operated by certain corporations spoken of by the appellants as the Costanzo interests. A substantial part of the output of coal was being sold to the Ohio Edison Company, an electric utility company which operated a generating plant on the Ohio River thirty miles up stream and was able to save 35c a ton in transportation expense by its accessibility to the mines. Difficulties encountered by the Costanzo interests in the operation of the mines in 1941 and 1942 led to an investigation of the properties by experts employed by the Ohio Edison Company as a possible purchaser. They reported that as of January 1, 1942, the mines and equipment had a value of $1,130,291 and that an expenditure of $317,285 was needed to put the mines in good order and condition so as to produce 600,000 tons per year. The Ohio Edison Company declined to purchase the property. Thereupon, on August 21, 1942, the Warner Coal Company, appellant in this case, was formed and on August 26, 1942, acquired a lease from the owners with the right to operate the mines.

The lease ran for a term of twenty years from September 1, 1942. The lessee acquired the sole right of mining and removing all the merchantable coal in the mine during this period with the option of four additional periods of five years each, paying a royalty of 12c per net ton. It was agreed that the lessee, during the original or extended term, should mine and remove or pay for a total minimum quantity of coal equal to 4,300 tons per acre of the acreage set forth in the lease. The lease recited that the lessee was acquiring under separate agreement title to all the machinery and accessories of the mines and that such machinery and accessories were sufficient to mine and prepare 70,000 tons of coal per month.

It was agreed that the fixtures and equipment should be and remain the property of the lessee and might be removed by the lessee at any time during the period of the lease or after its termination, subject, however, to the following limitations: If and when the lessee should mine or pay for all of the coal required to be mined by the lessee under the terms of the lease, the lessors would convey to the lessee all of the machinery and accessories in the mines and the lessee might thereafter remove the same from the mine; but, if prior to the date when the lessee should have mined or paid for all of said coal any of the machinery or equipment should be removed by reason of being worn out or obsolete, or in order to conform to the plans of the lessee, the lessee would replace the equipment removed with sufficient equipment to mine and prepare at least 70,000 tons of coal per month; and if the lease should be terminated for any reason before all the coal required to be mined by the lessee should have been mined or paid for, the lessee would surrender the mines to the lessors sufficiently equipped with equipment and supplies standard to that time to mine and prepare 70,000 tons of coal per month.

In order to assist the new company financially, the Ohio Edison Company advanced to it $100,000 and took a receipt for prepaid coal; the Cleveland Cliffs Iron Company advanced $50,000 on the company's note with the understanding that it would be allowed to purchase about one-half of the output of the mines for railroad transportation; and W. H. Warner and Company, Inc., a corporation engaged in the business of selling coal and furnishing management services to coal operators, paid to the Coal Company $50,000 for all of its capital stock.

Out of the funds so provided, the lessee coal company was enabled to pay to the lessors $10,000 for the leasehold interest in the mines and $90,000 as the purchase price for the mine equipment and machinery acquired from the lessee under a separate agreement. The Ohio Edison Company, for its own protection, required that $90,000 of the money advanced by it should be placed in escrow by the lessee pending the transfer of title of the mining machinery and equipment from the lessors to the lessee. The escrow agreement, originally dated contemporaneously with the lease, was superseded by an agreement of August 31, 1942. It provided that the Costanzo interests should execute an instrument conveying to the lessee absolute title to all of the mining equipment and machin-

ery whereupon the said sum of $90,000 should be released from escrow and paid over to the lessor as the purchase price of the property. Subsequently on October 20, 1942, the lessors executed a bill of sale to the lessee whereby it sold unto the lessee the mine equipment, of which it was already in possession, and covenanted that the grantors were the lawful owners thereof and that the same was free and clear from all encumbrances.

The Coal Company entered into possession and took over the mines on September 1, 1942, and between that date and October 9, 1942, expended $89,076.22 in a program of needed changes and improvements. Of this sum only $6,000 was spent for equipment. But its operation of the mines from a business standpoint was never successful. There were breakdowns in the machinery and damages from a river flood in January, 1943; and these misfortunes, coupled with the dislocation incident to changes in operation, interfered with the production of coal and entailed additional costs. In February, 1943, Ohio Edison advanced an additional sum of $25,000 as a prepayment on coal to be delivered. In the same month operating costs were unavoidably increased by an order of the War Labor Board which required the lessors to work six days per week instead of five, with payment of time and a half for the sixth day; but a price increase for the coal mined was not authorized by the Office of Price Administration until June, 1943. The contract between the Coal Company and the United Mine Workers expired on March 31, 1943, and a period of labor disturbances and work stoppages ensued in this and other mines until finally all the coal mines were seized by the United States under executive order. During the period of government operation the president of the Coal Company ran the mines as the operating manager for the United States. Under government coutrol the labor troubles continued with further work stoppages and the efficiency of operations was so impaired that in the middle of June, 1943, it was found that it cost 51c per ton more to mine the coal than it could be sold for under the O.P.A. ceiling price. Ineffectual attempts were made to sell the lease and to secure financial assistance from the United States. Finally on June 15th the directors determined to suspend work for one week, and thereafter no coal was mined until an operating receiver was appointed by the court in the following October. In the interval the Coal Company continued to make improvements to the property.

On August 28, 1942, the Coal Company had entered into a contract with the Ohio Edison Company to sell it 30,000 tons of coal a month for the ensuing year; and about the same time contracted with the Cleveland Cliffs Iron Company to sell it about one-half of its output. At no time from the inception of operation by the Coal Company until it suspended operation did it make the full deliveries of coal as agreed to the Ohio Edison Company. The Coal Company was undoubtedly in a financial condition of extreme difficulty. Its biweekly payroll was approximately $30,000; but after May 31, 1943, its cash available at no time exceeded $3937. A balance sheet taken from its books as of May 31 showed a net deficit of $130,152.77 and a net deficit as of June 30, 1943, of $146,278.56. These balance sheets included as assets the leasehold interest at $9,567.57 and the mining machinery and equipment at $91,773.21 on May 31 and $91,530.25 on June 30. The profit and loss statement showed that the company lost $21,883.81 for the period April 1 to May 31, 1943, and $38,009.60 for the period April 1 to June 30, 1943.

In this state of the Coal Company's affairs legal proceedings were instituted against it by the Ohio Edison Company, which resulted in an attachment of property of the Coal Company that forms the basis of the charge that it committed an act of bankruptcy as defined in § 3 of the Bankruptcy Act as amended, 11 U.S.C.A. § 21. Suit was filed on June 17, 1943 in the Common Pleas Court of Cuyhoga County, Ohio for breach of contract in the sum of $261,000 based upon the cash advances made by the Ohio Edison Company and damages claimed by it for non-delivery of coal; and a bank balance of the Coal Company in a Cleveland bank in the sum of $3477 was attached. The attachment remained in effect throughout the bankruptcy proceeding which was instituted on October 9, 1943, and resulted in an adjudication on February 10, 1944. It is not questioned that thereby the Coal Company committed an act of bankruptcy, if it was insolvent at the time, since it suffered and permitted a creditor to obtain a lien upon a portion of its property through legal proceedings, and did not vacate or discharge the lien within thirty days from the date thereof.

■ It is, however, contended, and this is the chief reliance of the Coal Company in this appeal, that when the alleged act of bankruptcy occurred, it was not insolvent within the meaning of § 1 (19) of the Bankruptcy Act, 11 U.S.C.A. § 1 (19), since the aggregate value of its property at a fair valuation was sufficient in amount to pay its debts. Error is asserted in that the judge excluded from the jury evidence which tended to show that the leasehold interest of the Coal Company had a fair market value of $61,457.87 and that the equipment and machinery described in the bill of sale had a fair market value of $292,400.32. In the evidence proffered the value of the leasehold was estimated by adding to the sum of $10,000 paid by the lessee to the lessor, when possession of the mines was transferred, the amount of money subsequently spent by the lessee in making improvements to the property; and the value of the equipment and machinery was based upon qualified expert opinion. If the testimony had been admitted and had been accepted by the jury at its face value, it would have shown that the Coal Company was solvent on the critical date since there would have been added to the assets as of May 31, 1943, the sum of $258,204.57 which would have wiped out the deficit of $130,152.77 shown by the balance sheet of that date. Similarly, the addition of these values to the assets on hand June 30, 1943, would have shown a surplus of $112,183.19 instead of a deficit of $146.278.56, as shown by the balance sheet of that date.

The evidence was excluded because it was the court's view that the Coal Company did not have such unencumbered title to the properties as to enable it to list them at their fair market value among its assets. In the court's opinion the Coal Company was not entitled under its lease to treat the machinery and equipment as its own until it had mined or paid for the stated amount of coal during the twenty year period, at the very beginning of which the Company had failed to carry on or to mine enough coal to fill its contracts. Similarly, the court held that the improvements made by the Coal Company in the mine did not become assets at their cost value in determining solvency, especially as the lease was not assignable and the Coal Company, although it had not defaulted on the lease, had shown no capacity to continue to comply with its terms. It may be added that even if the evidence of the estimated

value of the leasehold had been received in evidence, the balance sheet would still have shown a deficit.

We think this decision was correct. It is urged upon us that the lease and the bill of sale should be read as separate instruments, and that although the former granted only a qualified title to the machinery and equipment, conditioned upon the extraction of the agreed amount of coal, the latter expressly gave the lessee, upon the payment of $90,000, an unqualified and absolute title to the property, and should therefore prevail as the later document. As a matter of fact, however, the lease and the escrow agreement were practically simultaneous in execution and the bill of sale was executed later merely to carry out the agreement set out in the earlier documents. The escrow agreement was needed because the lease merely referred to another agreement under which the lessee would acquire title to the machinery and supplies, but did not set out the terms. When these agreements are read or construed together, as manifestly they should be, it is clear that the parties intended that the Coal Company should be given complete control of the machinery and equipment and title thereto, except that the Coal Company should use the equipment to mine the coal and, failing that, to surrender the mines sufficiently equipped to mine 70,000 tons of coal per month. No other construction seems tenable to us, because the financial condition of the Coal Company was undeniably weak from the beginning, and it is not likely that the lessors would take $90,000 for $290,000 worth of equipment unless it was to be used to mine the coal and produce royalties for their benefit.

■ The court was justified in directing a verdict for the petitioning creditors. They had proved the insolvency of the Coal Company from its own books which showed not only a business run at a loss but a deficit of more than $130,000. The countervailing evidence was based on the erroneous theory that the Coal Company had an absolute title to the machinery and equipment and, except for the showing that the Coal Company had bought $6,000 of additional machinery after entering into possession, there was no evidence that the interest of the Coal Company in the machinery and equipment had a greater value than the sum of $90,000 at which the Coal Company had purchased it and was carrying it on its books. En-

cumbered as it was with the obligation that it should be used and subjected to wear and tear for a long period in mining operations, it cannot be said, in the absence of any evidence, that it had a greater value in the hands of the Coal Company. The situation was akin to that which confronts a court of bankruptcy when it is called upon to value the equity of a mortgagor in the mortgaged property in determining the question of his solvency. In such an instance the value of the property when considered free from the encumbrance does not control. See, Lansing Boiler & Engine Works v. Joseph T. Ryerson & Son, 6 Cir., 128 F. 701; Acme Food Co. v. Meier, 6 Cir., 153 F. 74; In re Cleveland Discount Co., D.C.Ohio, 9 F.2d 97; see also, Midwest Fuel & Timber Co. v. West, 10 Cir., 106 F.2d 973.

■ It was, therefore, proper to apply the rule as to directed verdict set out in Brady v. Southern Ry. Co., 320 U.S. 476, 479, 480, 64 S.Ct. 232, 234, as follows: "When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding by non-suit, directed verdict or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict. By such direction of the trial the result is saved from the mischance of speculation over legally unfounded claims." See, also, Industrial Bankers Securities Corp. v. Higgins, 2 Cir., 104 F.2d 177; Atlantic Coast Line R. Co. et al. v. Smith Bros., Inc., 5 Cir., 63 F.2d 747, certiorari denied 289 U.S. 761, 53 S.Ct. 795, 77 L.Ed. 1504.

■ The additional contention is made that the bankruptcy proceeding was invalidated by collusion amounting to fraud between the petitioning creditors and the lessors of the coal mines. The charge rests upon the fact that of the three claims of the original petitioning creditors, aggregating $1536.91, two claims, amounting to $1529.58, were filed by corporations controlled by the lessor Costanzo interests. It is said that the lessors were not entitled to a forfeiture of the lease, when the suit was instituted, because the Coal Company had performed all of the covenants on its part; and that in order to obtain a forfeiture the lessors ruthlessly took advantage of the Coal Company's distress by filing the

pending proceeding, intending thereby to terminate the leasehold for which the Coal Company had paid $10,000 and to regain title to property upon which the Coal Company had spent $84,076.22 in improvements, as well as title to machinery and equipment worth $292,400.30 for which the Coal Company had paid $90,000. It is shown also that the Ohio Edison Company intervened as a creditor at the beginning of the trial; and it is argued that the contention of the petitioning creditors that the lease and the machinery and equipment should not be classed as assets of the Coal Company is so plainly contrary to the petitioners' interest as general creditors that the whole proceeding should be considered collusive and fraudulent.

In our opinion, the admitted facts furnish no support for the charge of fraud. No misrepresentation or deceit was employed by the Costanzo interests or by the Ohio Edison Company; and no interference with the Coal Company in the exercise of its rights as lessee occurred. Its failure to run the business successfully and to keep its contracts to furnish coal to the purchasers was due to its own financial weakness and to a combination of unfortunate circumstances for which the petitioning creditors were in no way to blame. The cessation of the mining of the coal and the attachment suit in Ohio were incidents in the breakdown of the business, and the application of the Costanzo interests and of the Ohio Edison Company for the appointment of a receiver and an adjudication in bankruptcy was an assertion of their undoubted rights rather than an act of collusion or fraud.

■ We fail to understand on what theory it can be said that the seizure of the mines by the federal government on May 1, 1943, under Executive Order 9340, Fed.Reg. Vol. 8, p. 5695, exempted the Coal Company from the provisions of the Bankruptcy Act. The order authorized the Secretary of the Interior to take possession of the mines and to operate or arrange for the operation of the mines for the successful prosecution of the war, but directed the Secretary to permit the management to continue its managerial functions to the maximum degree possible consistent with the aims of the order. The Regulations for the operation of the mines issued by the Secretary on May 19, 1943, Fed.Reg. Vol. 8, p. 6655, provided that the mining companies should remain subject during gov-

ernment control to all federal and state laws and to actions, orders and proceedings of all federal and state courts and administrative agencies. Under this order and regulation there was no interference with the operation of the Coal Company's mines. Its president was named operating manager for the United States and the business proceeded as usual, and, in accordance with the terms of the Secretary's regulation, remained subject to the operation of the federal statutes and the jurisdiction of the federal court. Cf. Glen Alden Coal Co. v. N.L.R.B., 3 Cir., 141 F.2d 47.

The judgment of the District Court is affirmed.