**KAVANAS et al. v. MEAD.**
No. 5794.

United States Court of Appeals
Fourth Circuit.
Dec. 20, 1948.

Melvin W. Kahle, of Wheeling W. Va., for appellants.

Carl G. Bachmann, of Wheeling, W. Va., for appellee.

Hugh Wells, of Cleveland, Ohio, and Charles McCamic, of. Wheeling, W. Va., amici curiæ.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This is an appeal from a decree in bankruptcy which denied priority to certain wage claims of miners in the employ of the

bankrupt, Warner Coal Corporation, and allowed them merely as general claims. The governing statute, Section 64, sub. a(2) of the Chandler Act, 11 U.S.C.A. § 104, sub. a(2), provides: "The debts to have priority, in advance of payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be * * * (2) wages, not to exceed $600 to each claimant, which have been earned within three months before the date of the commencement of the proceeding, due to workmen, servants, clerks, or traveling or city salesmen on salary or commission basis, whole or part time, whether or not selling exclusively for the bankrupt." The question on this appeal is whether the wages claimed by the miners were "earned within three months before the date of the commencement of the proceeding."

Warner Coal Corporation ceased mining operations on June 15, 1943. It had been involved in litigation in the Common Pleas Court of Cuyahoga County in the State of Ohio, which resulted on June 17, 1943, in an attachment of Warner's bank balance in the sum of $3477; and the suffering of this lien while insolvent constituted the act of bankruptcy on which were based the involuntary petition in bankruptcy filed against Warner on October 9, 1943, and the adjudication in bankruptcy on February 10, 1944. See Warner Coal Corp. v. Costanzo, 4 Cir., 144 F.2d 589. A receiver was appointed in the bankruptcy proceedings on October 22, 1943, and began to operate the mine on October 23, 1943. From June 15 to October 23, Warner retained only a small maintenance crew. The receiver, although not a party to the contract between the operators and the miners' union, nevertheless operated the mine according to its terms.

The current wages up to October 1, 1943, were paid by the bankrupt. The District Judge held that wages earned from October 1 to October 9, 1943, were entitled to priority, and that wages earned from October 9 to October 23, when the receiver began operations, should be allowed as part of the necessary costs of preserving the bankrupt estate. In the order authorizing the receiver to operate the mines, the District Judge expressly stated that the basic wages of the miners, after the date of the appointment of the receiver, would be preferred charges against the receiver, and this statement has been given effect. The District Judge, however, refused priority to the claims involved in this appeal on the theory that the amounts claimed were not earned within three months before October 9, 1943, when the petition in bankruptcy was filed. These claims are as follows:

1. (Lamp Refunds) From April 1 to June 7, 1943, the bankrupt deducted 8c per shift from each man's wages for the use of lamps furnished by the employer. On June 7, 1943, a directive of the War Labor Board required the operators, including the Warner Coal Corporation, thereafter to furnish the lamps without charge and also to refund the money deducted for this purpose between April 1 and June 7 on the next pay day which, in this case, would have been July 10, 1943. These claims amount to $1261.68.

2. (Back Pay) Under the contract in force between the miners and the operators between April 1 and June 7, 1943, stonepickers' wages amounted to $5.15 per day. Under the directive of the War Labor Board of June 7, these wages were raised to $6.00 per day and the increase was made retroactive to April 1, 1943, and the refund became payable on July 10, 1943, the next pay day. These claims amount to $293.06.

3. (Portal to Portal Pay) On December 17, 1943, the United Mine Workers and the coal operators signed a compromise agreement which fixed the amount to be paid to the miners for portal to portal pay from April 1 to June 20, 1943. The contract provided that each miner on the pay roll during this period should be paid not later than June 25, 1944, the sum of $40, (50c per day for 80 days) in full satisfaction of his claim for portal to portal pay, which should have been included in his weekly pay during the period, under the decision of the Supreme Court in Jewel Ridge Coal Corp. v. Local No. 6167, 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534, These claims amount to $16,915.50.

4. (Vacation Pay) These claims relate to vacation pay for the period from June

28, 1942, to June 27, 1943, in the sum of $14,950, and vacation pay for the period from June 28, 1943 to October 23, 1943, in the sum of $2885.48. Under the contract between the miners and the operators the vacation pay for the first mentioned period would have amounted to $20 for each miner, payable on June 25, 1943, subject to the provision, however, that qualified employees of mines which suspended operations prior to the end of the qualifying period and remained idle for the balance thereof, should receive their vacation pay not later than the third pay day after the resumption of operations which, in this case, would have been December 10, 1943. A directive of the War Labor Board of May 25, 1943, increased the vacation pay from $20 to $50 per man.

During a part of the year beginning June 28, 1943, that is from June 28, 1943, to October 23, 1943, the mine was idle and only a maintenance crew was employed. The receiver, who began operations on October 23, 1943, paid to the men employed by him a proportionate part of the vacation pay for this year based upon the time that they were employed by him, that is to say, from October 23, 1943, to June 27, 1944. The District Court held that the miners who earned no wages from July 9 to October 9, when the bankruptcy proceedings were instituted, were not entitled to priority for vacation pay for this period, but allowed the amounts claimed as general claims against the estate. Miners who earned wages from July 9 to October 9, 1943, were held to be entitled to priority for vacation pay for the three months' period, that is, one-fourth of the vacation pay for the year from June 28, 1943, to June 27, 1944.

The appellants contend, first, that the crucial date under Section 64, sub. a(2) for the determination of wage claims was not October 9, 1943, when the petition in bankruptcy was filed, but rather June 17, 1943, the date of the attachment proceeding in the state court; and hence their claims should be given priority since the services to which they relate were all performed during three months prior to June 17, except for part of the vacation pay. Appellants maintain that where litigation in a state court leads directly to bankruptcy proceedings in the federal court, the institution of proceedings in the state court should be regarded as the commencement of the bankruptcy proceedings, and claims for labor arising within a period of ninety days prior to the beginning of the litigation in the state court are entitled to priority. There is nothing in the statute, however, which supports this position. Appellants rely upon our decision in Manly v. Hood, 37 F.2d 212; but that decision is not in point. It was there held that, where bankruptcy followed a state receivership in which wage earners had a preferred claim upon the assets of an insolvent for wages earned within three months prior to the commencement of the proceeding, they would be accorded like priority in the bankruptcy proceeding on two theories: (1) that the bankruptcy proceeding was a mere continuation of the insolvency proceedings commenced in the state court and that the three months period should be held to have reference to the commencement of the insolvency proceedings, which placed the assets in custodia legis beyond the reach of attachment, rather than to the filing of the petition in bankruptcy which merely transferred the control of the assets from the state court to the court of bankruptcy; and (2) that the state insolvency proceeding created a priority in favor of wage earners which would be preserved under Section 64, sub. b(7) of the Bankruptcy Act. Neither theory fits the facts of the instant case. The attachment of the bank account in Ohio did not deprive the employer of the control of the business and place it in custodia legis as a receivership in the state court would have done; nor did the attachment give rise to a priority in favor of the wage earners under the statutes of West Virginia. Moreover, Section 64 of the Bankruptcy Act, as amended by the Chandler Act of 1938, 11 U.S.C.A. § 104, no longer recognizes priorities created by the laws of the state except for rent. The same conclusion is reached if the more literal construction of Section 64, which prevails in other circuits, is applied. See Strom v. Peikes, 2 Cir., 123 F.2d 1003, 138 A.L.R. 937; In re Ko Ed Tavern, 3

Cir., 129 F.2d 806, 142 A.L.R. 357; In re Rouse Hazard & Co., 7 Cir., 91 F. 96; In re Slomka, 2 Cir., 122 F. 630.[1]

■ Next, it is contended that in considering the validity of wage claims under Section 64, sub a(2) we must look to the date on which the wages are due rather than to the period during which they are earned; and therefore the claims in the pending case are entitled to priority because the claimants did not establish their legal right to the amounts claimed until after the commencement of the three months' period. Thus it is pointed out that the claims for lamp refund and back pay were not payable until July 10, 1943, the claims to portal to portal pay were not established prior to the compromise agreement of December 17, 1943, and the claims for vacation pay for the year ending June 27, 1943, did not become payable until December 10, 1943, that is, the third pay day after the resumption of operations of the mine.

The plain language of the statute, however, is to the contrary. The limitation of three months before the commencement of bankrupt proceedings refers to wages "earned" within the three months' period, while the word "due" is used in the sense of owing, and points to the classes of employees to whose claims priority is accorded. It is obvious that all of the claims, except part of the claims for vacation pay had been fully earned more than three months before October 9, when the petition in bankruptcy was filed, that is, the lamp refunds and back pay had been earned between April 1 and June 7, and the portal to portal pay had been earned during the period from April 1 to June 20, 1943; and this situation is in no wise altered because payment for the sums was deferred until after the three months' period had begun. Priority of wage claims is determined entirely by the period of service.

■ The same conclusion must be reached in regard to vacation pay for the period from June 28, 1942, to June 27, 1943, which had been completely earned on the last mentioned date. We do not agree with the conclusions reached in In re Kinney Aluminum Co., D.C.S.D.Cal., 78 F. Supp. 565, insofar as they are at variance with those announced herein; and we have no occasion to decide the question at issue in that case, that is whether the full amount of vacation pay for the entire year rather than only a portion thereof, would be entitled to priority if the year's service had terminated within the three month period. See also In re Magazine Associates, Inc., D.C.S.D.N.Y., 43 F.Supp. 583; In re B. H. Gladding Co., D.C.R.I., 120 F. 709; In re Public Ledger, Inc., 3 Cir., 161 F.2d 762.

The decision of the District Judge as to the balance of the claims gives the claimants no cause for complaint. The miners who performed no services during the three month period preceding bankruptcy were clearly not entitled to priority in respect to vacation pay based on that period, and those who worked during that period were fully compensated in this respect by the allowance of priority to vacation pay for one-fourth of a year.

Affirmed.

---

[1] The appellant also relies on decisions relating to the "six months' rule" under which current expenses of a business incurred during a limited period prior to a receivership in equity have been held payable out of the receiver's revenues; but it is obvious that in bankruptcy the priority of wages is expressly limited to the three months' period by the statute.