**UNITED STATES of America,**
**Plaintiff,**

v.

**WISCONSIN VALLEY TRUST COMPANY, Defendant.**

**Civ. A. No. 3444.**

United States District Court
W. D. Wisconsin.
Sept. 1, 1964.

74

John F. Beggan, Attorney, Tax Division, Department of Justice, Washington, D. C., for plaintiff.

Charles F. Smith, Smith, Puchner, Tinkham & Smith, Wausau, Wis., for defendant.

RABINOVITZ, District Judge.

The Court has jurisdiction of this matter by virtue of 28 U.S.C.A. § 1340, which is a suit at the instance of the United States of America against the defendant for the collection of Internal Revenue Taxes.

The matter came on before the Court, without a jury, on July 11, 1964, at Wausau, Wisconsin; Mr. John F. Beggan, Attorney, Tax Division, Department of Justice, Washington, D. C., appearing for the plaintiff; Mr. Charles F. Smith, Sr., and Mr. John L. O'Brien, Attorneys, Wausau, Wisconsin, appearing for the defendant.

This is a civil action brought by the United States of America to obtain judgment against the Wisconsin Valley Trust Company because of the latter's payment, as assignee for the benefit of creditors of and as Receiver of Clintonville Transfer Lines, Inc., under Chapter 128 of the Wisconsin Statutes, of various debts of that corporation.

The Government claims that the defendant paid certain wages and vacation pay to employees of the defunct company, which the Government alleges were earned prior to July 25, 1955, being the date of the assignment, without first satisfying the debts, namely taxes, of that corporation due to the United States.

The total tax liability was $114,799.28. This matter was adjudicated before the Honorable Gerald Boileau in Circuit Court of Marathon County, Wisconsin, and final order was entered by said court on December 2, 1959, as of November 27, 1959, approving the final account and discharging the Receiver, hearing having been held in this matter on November 27, 1959. All interested parties appeared, including Mr. George Rapp, then United States Attorney for the United States Government.

The Statutes involved are Sections 191 and 192, Title 31 U.S.C.A. which read as follows:

"§ 191. Priority established

"Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority established shall extend

as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

"§ 192. Liability of fiduciaries

"Every executor, administrator, or assignee, or other person, who pays, in whole or in part, any debt due by the person or estate for whom or for which he acts before he satisfies and pays the debts due to the United States from such person or estate, shall become answerable in his own person and estate to the extent of such payments for the debts so due to the United States, or for so much thereof as may remain due and unpaid."

The Wisconsin Valley Trust Company took charge of the business as Receiver the day after its appointment, namely, July 26, 1955, and operated the company as a going concern consisting of between 250 and 300 employees, and 300 units of rolling stock, trucks, semi-trailers and tractors. The firm was so operated for about six weeks, and on September 10, 1955, was sold as a going business. This was the purpose of the Receivership. The corporation did business in Wisconsin, Minnesota and Illinois, and had many connecting lines with trucking companies in other states. It had terminals and men there employed situated around the country.

The Government alleges that it received $68,358.17 on account of the claimed tax liability, and that a balance of $79,278.11, including unassessed interest to July 8, 1964, remained unpaid.

It is claimed by the United States that the Wisconsin Valley Trust Company made payments for payroll for the periods, on the dates and in the amounts set forth in the following schedule (Pltf. Exs. 1 and 2, par. 12):

| Payroll Period Ending | Date of Payment | Net Payroll Paid |
|---|---|---|
| 7–23–55 | 7–29–55 | $25,908.73 |
| 7–26–55 | 8–5–55 | 12,015.33 |
| | TOTAL | $37,924.06 |

The defendant also made payments for vacation pay accrued and due as of July 26, 1955, which were included in certain payrolls prepared and paid in later payroll periods as set forth in the following schedule (Pltf. Exs. 1 and 2, par. 13):

| Vacation Pay Accrued Prior to 7–26–55 Included in Payroll for Period Ending | Date of Payment | Net Amount of Accrued Vacation Pay Included In Payroll Paid |
|---|---|---|
| 7–30–55 | 8–5–55 | $ 920.36 |
| 8–6–55 | 8–12–55 | 1,908.18 |
| 8–13–55 | 8–29–55 | 2,053.28 |
| 8–20–55 | 8–26–55 | 2,407.28 |
| 8–27–55 | 9–2–55 | 1,699.35 |
| 9–3–55 | 9–9–55 | 1,242.57 |
| 9–10–55 | 9–16–55 | 208.15 |
| | TOTAL | $10,439.17 |

The Court will note at this time that the term "wages" includes vacation pay. It has been repeatedly held that vacation pay is wages within the meaning of the Bankruptcy Act. United States v. Munro-Van Helms Co., 243 F.2d 10 (5th Cir. 1957); Division of Labor Law Enforcement v. Sampsell, 172 F.2d 400 (9th Cir. 1949); Kavanas v. Mead, 171 F.2d 195 (4th Cir. 1948); In re Otto, 146 F.Supp. 786 (D.C.Cal.1956). The vacation pay, as wages, was a necessary expense in administering this estate and it is entitled to priority as such an expense.

After the payment of administration expenses and the claims of a mortgagee, all remaining moneys were paid over by the Receiver to the United States Government on account of the tax liability.

On November 27, 1959, a hearing was held before the Honorable Gerald Boileau, Circuit Judge, on the matter of the final account of the insolvent company. Mr. George Rapp, then United States Attorney for the Western District of Wisconsin, appeared for the United States Government. On behalf of the Government he requested that he have the right to see the books of the company and have same examined by a Government representative.

On page 27 of the transcript of that hearing, Mr. Rapp said:

"We don't want to make a formal objection."

The Court said on page 28:

"THE COURT: The Court has heretofore entered an order with respect to the order in which the priority should be respected—

"MR. RAPP: That's right.

"THE COURT: You are not objecting to that now?

"MR. RAPP: No. sir.

"THE COURT: You have had your chance to object to that and you have not. The only question now is whether the court has followed this in respect to these priorities?"

On page 37 the following appears:

"THE COURT: Anyone who desires to make any inquiry with respect to the costs of administration, or anyone here who is objecting desire any further information with respect to the costs of administration?"

Mr. Rapp did object to the fees of attorneys and the Receiver, and the court went into great detail explaining the fact that a great amount of work was performed by the Receivers and the attorneys due to the poor bookkeeping system, and the great amount of work involved in maintaining the insolvent as a going business. The court declared a short recess and then later confirmed the administration expense.

On page 51 the court said:

"THE COURT: Do I understand that you are making a formal objection and desire to have further testimony presented on this matter?

"MR. RAPP: No. Your Honor.

"THE COURT: No.

"MR. RAPP: No.

"THE COURT: No further objection. No one else making any objection. Proceed."

Mr. Rapp did make inquiry as to whether or not the payroll was split-up as of the date of the appointment of the Receiver and whether the Receiver paid any so-called back wages at the time he assumed office. On page 57 Mr. Rapp said:

"MR. RAPP: Again, Your Honor, may I make this suggestion. That since the government is going to receive all the balance and our rights are not going to be destroyed in any event, if we have a claim it will be against the receiver for an illegal payment."

The Court stated on page 58:

"THE COURT: The court is satisfied that the receiver must have understood the court's order in that respect and no doubt complied with it." (The court was referring to

the payment of the wages and vacation pay.) "However, I can see no reason why this matter should be held up pending the government investigation because as Mr. Rapp said, if he has any claim it would be against the receiver for making an unauthorized payment. Are there any other objections? Anyone desire to offer any evidence here?"

There was no further statement made by Mr. Rapp on the record in this respect.

It is this Court's opinion that the United States could have resorted to various methods in protecting their interests on their contention that accrued wages and vacation pay were paid to employees.

First of all a motion could have been made by Mr. Rapp contesting the hearing on the final account and ascertaining whether such payments for wages and vacation pay were made by the Receiver.

Secondly, the Government could have appealed to a higher court from the decision of the Circuit Court.

The various colloquies show that the United States Government at least tacitly consented to the allowance of the account. This matter was before the Circuit Court for a considerable period of time, namely, from the date of the appointment, July 26, 1955, to the date of the final hearing on November 27, 1959. That court was in a position to judge the rights of the respective parties much better than the hindsight of this Court. I therefore hold that the proceedings had before the Circuit Court are now res adjudicata, and that all conflicting issues were resolved and adjudicated before the Circuit Court.

A somewhat similar situation arose in United States v. Crocker, 194 F.Supp. 860 (D.Nev.1961), in which the District Court held that receivers appointed by State Courts were not within the coverage of the Federal Statutes cited herein. This case was reversed in 313 F.2d 946 (1963) holding that the court appointed

receiver was not absolved from personal liability under Section 192. The District Court had held that the appointing court, here the Circuit Court, was in a better position to interpret the Statutes of that state. The Appeals Court did not comment upon that finding by the District Court.

Further, the Court of Appeals in Crocker stated as follows:

"It likewise follows that a receiver who knowingly distributes the assets in disregard of that priority is personally liable under Section 192."

This Court finds that the Receiver assumed his office without knowledge of the fact that taxes were due to the United States. It was first advised of its appointment on July 26, 1955, and the first notice it received from the United States as to any indebtedness of the defunct company was on October 18, 1955, being a letter from the District Director of Internal Revenue. The Receiver caused the books to be audited; and the audit was not completed until some time in October, 1955. The auditor testified prior to October 28, 1955, he had not advised the Trust Company of any indebtedness due to the United States.

In State of Delaware v. Irving Trust Co., 92 F.2d 17 (2nd Cir. 1937) the complaint was dismissed because no notice was given, prior to the making of certain payments. The Court said:

"It is the duty, however, which has been repeatedly referred to as a qualified one, applicable only where the trustee is on notice of the existence of taxes."

This Court is inclined to follow the rationale of United States v. Stephens, 208 F.2d 105 (5th Cir. 1953), notwithstanding the distinction attempted in the Crocker case, supra, that the Receiver in this matter was an officer or an arm of the Court and was not within the purview of Sections 191 and 192, 31 U.S.C.A. The court, at page 109 of 208 F.2d, stated:

"When, as here, it appears that the defendant, sued as a personal

representative who has violated the statute, is not such but is a receiver, an officer or arm of the court, it is quite clear, we think, that the defendant is not within the statute and that the suit was properly dismissed. Textbooks and cases declaring and holding that the receiver is not the representative of the debtor but an officer or arm of the court are legion. Many of them are cited in the notes to the texts cited from American Jurisprudence, supra."

The evidence does show that part of the payroll period probably was for work performed prior to the appointment of the Receiver. This Court has not been furnished with an accurate breakdown in dollars and cents as to how much accrued before and after the appointment of the Receiver. One payroll period is designated as ending July 23, 1955; and that two other payroll periods ended July 26, 1955. The vacation pay periods are designated as accruing all the way from July 30, 1955, to September 10, 1955.

The Receiver in this matter was confronted with a situation where it was directed to immediately assume charge of this trucking line as a going concern, which had due and owing to its employees wage and vacation pay. Between 250 and 300 payroll checks were presented to the Receiver on July 28, 1955, for signature. The checks were signed.

An officer of the Trust Company testified before this Court as follows (T. 43):

"Q. And did you sign those checks?

"A. I did.

"Q. Did you, at the time you signed those checks, know of any claim that the Government had, for taxes or otherwise?

"A. I did not.

"Q. Now, some of these checks are noted in the books as for wages due to July 23, 1955. Do you know what day of the week July 23rd was?

"A. It was Saturday; in 1955.

"Q. Would wages become due at the end of each week?

"A. Yes.

"Q. And the Receiver was appointed July 26th, which would have been Tuesday; is that correct?

"A. Yes.

"Q. And you signed the checks a day or two later than that?

"A. Yes.

"Q. Now, how did it happen that these checks had not—for wages due July 23rd had not been paid before that?

"A. The work-week ended on the preceding Saturday, and the various time-cards were accumulated from the various terminals and forwarded to the Wausau office, and usually arrived there on Monday, and were processed then on Tuesday, Wednesday and Thursday for delivery to the various employees at their respective terminals on Friday morning.

"THE COURT: Do you mean at the Wausau office of the Clintonville Trucking, or your office?

"THE WITNESS: Clintonville.

"THE COURT: They had an officer here in Wausau?

"THE WITNESS: Yes.

"MR. SMITH: Yes, and that was their head office.

"THE COURT: Wausau was their main office?

"THE WITNESS: Yes.

"THE COURT: All right.

"MR. SMITH:

"Q. The main offices of Clintonville and of Albrent Trucking were both here in Wausau?

"THE WITNESS:

"A. Yes.

"Q. With terminals spread around the country?

"A. Yes.

"Q. And as I understand you—this question is leading; I am just repeating it to get it clear—as I understand, it took two or three or four days for the time-card records to get from the terminals into the home office at Wausau and be processed?

"A. Yes.

"Q. And that is the reason for the payment by you of the wages due July 23rd on July 27th or 28th?

"A. Yes.

"Q. Now, the same thing would apply to the checks that were dated August 5th, would it not?

"A. Yes.

"Q. That would apply to the week ending just before that?

"A. July 30th.

"Q. July 30th. Now, there is some reference in some of the documents here to the week ending July 26th. There is no week ending July 26th, is there?

"A. Not a work-week, no.

"Q. So that must be an error. The dates that are important here are July 23rd, the end of that week, and July 30th?

"A. Yes."

Paul Schultz, an officer of the Receiver, was asked: "What would have happened if you had not paid those wages due three days before you were appointed Receiver?"

He answered as follows (T. 49):

"I found that the Unions provided that the men be paid on Friday morning of each week, and it appeared to us to be very necessary that we meet a payroll on that Friday morning to prevent a wholesale walkout of the employees."

Here is a Receiver that was confronted with the duty of running a business and the record shows that he was dealing with some 250 to 300 employees belonging to approximately 12 or 15 Labor Organizations. It was his duty to keep the business running and he could not do so unless he had truck drivers and maintenance men.

This Court takes notice of the facts of business life in that these employees would not continue working had they not been paid the wages due them. If the operation had been discontinued the Receiver testified that the Interstate Commerce Commission would have revoked the franchise and they would have obtained little or nothing for the business. Instead, the business was sold for approximately $125,000.00 on September 10, 1955, as a going business. The testimony shows that the company owned approximately 300 units, counting a tractor and a trailer as two separate units, and pickups and straight-body trucks as single units. These units had to be maintained and had to be run.

This Court holds, therefore, that there was no knowledge and certainly no wilful or intentional desire on the part of the Trust Company to avoid payment of taxes due to the United States of America.

There are a number of decisions which, while quite old, nevertheless bear on this subject.

In Skiddy v. Atlantic, M. & O. R. Co., 22 Federal Cases No. 12,922, page 274, an action was commenced on default of payment of interest on mortgage bonds issued by defendant railroad, which was a consolidation of seven lines. Along with the complaint, a motion for the appointment of a receiver was filed. The order appointing receivers, provided, among other things:

"* * * (to take possession and run the railroad) as the same is now operated for the Common carriage of freight and personal * * *; that they as such receivers have authority to employ, pay, and discharge, from time to time, in their discretion, all needful laborers, servants, agents, attorneys, and counsel, * * *."

Respecting the payment of wages, the court said at page 281:

"The first question of importance which came up for discussion, related to the wages past due and unpaid of the employés of the road. These were in arrears for the period of eight months. Upon argument it was decided that all back wages due to employés then actually in the employment of the company should be paid. The following order was entered on a representation of Receiver Fink that such a measure was necessary to the safe and successful operation of the road, and that he could not be responsible for the consequences of a refusal of it by the court, to the property of the company or the safety of passengers."

The Skiddy case was cited in Blair v. St. Louis, H. & K. R. Co., 22 F. 471 (Cir.Ct.E.D.Mo.1884), which cites a number of other cases where wage claims had been paid in preference to secured claims in order to maintain the conduct and running of a business.

In Texas Co. v. International & G. N. Ry. Co., 237 F. 921, at page 927 (5th Cir. 1916), the court said as follows:

"It is only necessary to show that the supplies that were furnished contributed to the creation of the current income, that it is looked to by the creditor, and that there was income in fact received by the railroad company equal in amount to what it currently cost to operate the railroad. * * * The equity of the rule lies in the manifest justice of paying those whose labor or material went to create the income which the mortgagee claims as part of his security, before the mortgagee receives it in payment of his debt. If the current expense could be specifically traced to the current income it creates, the application of the rule would be easy and definite. The impossibility of tracing each dollar of expense into the corresponding dollar of income created by it has made

it necessary for the courts to fix an arbitrary period beyond which it will not be presumed that labor and material furnished the railroad will continue to produce income."

The following appeared in an annotation in 5 A.L.R. 690, 691–2:

"Wages earned prior to the appointment of a receiver have likewise been held to be a first charge upon net earnings during the receivership, upon grounds which would entitle them to a preference out of the corpus, namely, that there has been, prior to the receivership, a diversion of the current earnings out of which such wages should have been paid * * *, or that payment was necessary in order to retain the services of employees needed by the receiver * * * [citing the Skiddy case, supra], or that the mortgagees have received a benefit from the continuance of the business as a 'going concern' for which they are bound in equity to pay."

In Miltenberger v. Logansport Railway Co., 106 U.S. 286, at page 311, 1 S.Ct. 140, at page 162, 27 L.Ed. 117 (1882), the court said:

"His action, sanctioned by the court, in allowing items within the scope of the orders of the court, appears to have been careful, discriminating, and judicious, so far as the facts can be arrived at from the record. It cannot be affirmed that no items which accrued before the appointment of a receiver can be allowed in any case. Many circumstances may exist which may make it necessary and indispensable to the business of the road and the preservation of the property, for the receiver to pay pre-existing debts of certain classes, out of the earnings of the receivership, or even the *corpus* of the property, under the order of the court, with a priority of lien. Yet the discretion to do so should be exercised with very great care. The payment of such debts stands, *prima facie*, on a different basis from the

payment of claims arising under the receivership, while it may be brought within the principle of the latter by special circumstances. It is easy to see that the payment of unpaid debts for operating expenses, accrued within 90 days, due by a railroad company suddenly deprived of the control of its property, due to operatives in its employ, whose cessation from work simultaneously is to be depreciated, in the interests both of the property and of the public, and the payment of limited amounts due to other and connecting lines of road for materials and repairs, and for unpaid ticket and freight balances, the outcome of indispensable business relations, where a stoppage of the continuance of such business relations would be a probable result, in case of non-payment, the general consequence involving largely, also, the interests and accommodation of travel and traffic, may well place such payments in the category of payments to preserve the mortgaged property in a large sense, by maintaining the good-will and integrity of the enterprisee, and entitle them to be made a first lien. This view of the public interest in such a highway for public use as a railroad is, as bearing on the maintenance and use of its franchises and property in the hands of a receiver, with a view to public convenience, was the subject of approval by this court, speaking through Mr. Justice Woods, in Barton v. Barbour, 104 U.S. 126, 26 L. Ed. 672."

Certainly in this instant case these payments to the employees had to be made to preserve the business. It is the Court's opinion that the Receiver would have been derelict in his duty had he not pursued the course he had for the purpose of preserving the assets which eventually were sold as a going business.

We have a situation here where the assignee was appointed on July 25, 1955;

hearing was had on the final account on November 27, 1959; and suit by the United States Government was commenced on May 19, 1961. Considering the remedies that were available to the Government under state law, as hereinbefore noted, it was, to say the least, most dilatory in starting suit some six years after the proceedings were commenced in the Circuit Court and about one and one-half years after the disposition of the matter in the state court.

The complaint of the plaintiff, the United States of America, is dismissed on its merits, without costs to either party.

The foregoing opinion incorporates the Court's findings of fact and conclusions of law in conformity with Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

The defendant will submit to the Court the judgment in conformity with this opinion.