## GLEN ALDEN COAL CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 8414.

Circuit Court of Appeals, Third Circuit.
Argued Nov. 16, 1943.
Decided Jan. 31, 1944.

---

J. Hayden Oliver and James J. Powell, both of Scranton, Pa. (Franklin B. Gelder and James W. McNulty, both of Scranton, Pa., on the brief), for petitioners.

Guy Farmer, N.L.R.B., of Washington, D. C. (Robert B. Watts, General Counsel, Howard Lichtenstein, Asst. General Counsel, Ruth Weyand, and Owsley Vose, all of Washington, D. C., and Herman Lazarus, and Robert H. Kleeb, both of Philadelphia, Pa., on the brief), for respondent.

Before BIGGS, MARIS, and JONES, Circuit Judges.

BIGGS, Circuit Judge.

Glen Alden Coal Company has petitioned this court to set aside an order of the National Labor Relations Board requiring it to cease and desist from refusing to bargain collectively with International Molders and Foundry Workers Union of N. A., Local No. 133, hereinafter referred to as the Molders Union, affiliated with the American Federation of Labor, as the exclusive representative of all of its foundry employees in a unit found to be appropriate, from restraining its employees in the exercise of their rights of self-organization and of collective bargaining through representatives of their own choosing in accordance with the provisions of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and to take the affirmative action set out in the Board's order.

Most of the facts are not in dispute. Glen Alden is the largest producer of Pennsylvania anthracite and is engaged in mining and preparing it for sale at its various collieries in Pennsylvania. In the year 1942 most of the coal mined by the petitioner was shipped to points outside the State of Pennsylvania while during that year the petitioner purchased nearly a quarter of a million dollars worth of supplies from vendors outside the State. The jurisdiction of the Labor Board is clear and undisputed.

The petitioner contends that the order of the Labor Board requiring it to enter into a contract with and recognize the foundry employees as a separate and appropriate unit for the purposes of collective bargaining when it has an existing contract with United Mine Workers of America, District No. 1, hereinafter called the United Mine Workers, to represent its employees, is an unreasonable and capricious use of the Board's discretion in determining the appropriate bargaining unit, is inconsistent with standards established by the Board and the courts, is contrary to the purposes of the National Labor Relations Act, and is illegal as an attempt to void a valid preexisting contract made by it with its employees.

Glen Alden employs about fourteen thousand persons in all of its operations. About two hundred fifty of these employees work at what is known as the Exeter Shop. The Exeter Shop consists of blacksmith, boiler, machine, carpenter, electrical and pattern shops, and a foundry. The Shop is conveniently located to the twelve collieries operated by Glen Alden. The Shop services these collieries and does no work except for them. At the time of the hearings there were approximately fifty men, exclusive of supervisory and clerical employees, employed in the foundry.

The Molders Union confines its membership among employees of Glen Alden to molders, core makers, chippers, grinders, laborers, cupola tenders and crane runners at the Exeter Shop. On November 23, 1942 the Board issued a Decision and Direction of Elections [1] in which it ordered an election to be conducted among the foundry workers at the Exeter Shop in order to determine representatives for the purposes of collective bargaining. The Molders Union and the United Mine Workers of America were the candidates on the ballot. The Molders Union won the election by a vote of 43 to 1. Fifty-six employees were eligible to vote. The Board therefore certified the Molders Union as the appropriate bargaining agent.

The United Mine Workers has a long history at the collieries operated by Glen Alden. At the turn of the century a bitter struggle occurred between the miners and the operators in the Pennsylvania anthracite region respecting issues of union recognition, pay and working conditions. To settle the dispute, President Theodore Roosevelt appointed an Anthracite Coal Strike Commission which made a number of awards. The first of these was made in 1903 and thereafter from time to time agreements were signed between the operators and representatives of the mine workers covering terms and conditions of operation. The original representation of the mine workers theoretically was by the "Anthracite Mine Workers' Organization". Under the agreement of 1920, however, the United Mine Workers of America formally represented the mine workers.[2] It has continued to represent them ever since. The agreement of May 26, 1939 between the United Mine Workers and the operators purports to cover all employees of Glen Alden excepting supervisory and clerical em-

ployees. The "recognition" clause of that contract provides, "It is agreed that United Mine Workers of America is recognized herein as the exclusive bargaining agency representing the employees of the parties of the second part. It is agreed that as a condition of employment all employees shall be members of the United Mine Workers of America except those in classifications recognized in the industry as exempt from such membership during the term of the Agreement of May 7, 1936." Foundry workers are not specifically excluded from the agreements nor are they specifically included. The agreements relate to the rights of "miners". It is clear from the record that the foundry employees at the Exeter Shop are not "miners", though their work is essential for the maintenance of mining operations.

It is helpful in the instant case to see how the United Mine Workers and Glen Alden themselves by their actions have interpreted the agreements. Since 1930 the agreements have provided for a check-off of union dues but it appears that the pay of the Exeter Shop employees has not been subject to any check-off. Since 1939 the contracts have contained a closed shop clause but no employee at the Exeter Shop[3] has ever been discharged or threatened with discharge because he was not a member of United Mine Workers. Since 1936 the agreements have provided for a seven hour working day for miners, but the foundrymen at the Exeter Shop have worked an eight hour day. The Exeter Shop employees, including the foundry employees, have not been represented in negotiations between the United Mine Workers and the operators and it seems clear that the United Mine Workers' representatives have not negotiated with the operators on behalf of the Exeter Shop employees. In

---

[1] In Case No. R-4400, 45 N.L.R.B., No. 111.

[2] In 1902 the operators would not negotiate with the United Mine Workers of America as a collective bargaining agency for the miners despite the fact that the President of the United Mine Workers of America appeared before the Anthracite Coal Strike Commission on behalf of the miners. The "Anthracite Mine Workers' Organization" was without any record affiliation. See Report to the President on the Anthracite Coal Strike of May-October, 1902, by the Anthracite Coal Strike Commission, Appendix G.

[3] We use the phrase "Exeter Shop" advisedly and are not referring specifically in this instance to the foundrymen at the Exeter Shop. The Board by a Decision and Direction of Elections (see note 1, supra) ordered an election for employees at the Exeter Shop other than foundry employees. Two hundred thirteen of these were entitled to vote. The candidates were the International Association of Machinists, affiliated with the American Federation of Labor, and the United Mine Workers. Neither candidate secured a majority and the Board therefore certified no representative for the purposes of collective bargaining.

1937 the United Mine Workers chartered a separate local at the Exeter Shop, but this franchise was revoked in 1937 at the request of the Exeter Shop employees after the local had failed to secure a contract with Glen Alden. In 1937 another charter was proffered by the CIO to the Exeter Shop employees in lieu of that which had been revoked, but the proffered charter was refused. In 1940 an affiliate of the CIO, the United Construction Workers, attempted to organize the Exeter Shop employees but had little success. In May, 1942, after the Molders Union began to organize the Exeter Shop employees, the CIO renewed its attempts at organization but again failed to achieve any substantial result. It appears also that since 1937 bargaining carried on between Glen Alden and the Exeter Shop employees has been conducted on behalf of these employees by a local unaffiliated committee.

■ We think that there is ample support in the evidence for the Board's finding that the United Mine Workers' agreements with the operators were not intended to cover the Exeter Shop foundry employees. In the light of these and other circumstances which we have narrated, it may not be said that the Board abused its discretion in finding that the foundry workers at the Exeter Shop constituted an appropriate collective bargaining unit. In National Labor Relations Board v. Delaware-New Jersey Ferry Co., 3 Cir., 128 F.2d 130, this court discussed a similar question. We stated there that the decision as to what is an appropriate bargaining unit is a delicate one which was expressly delegated to the Board by Section 9(a) and (b) of the National Labor Relations Act, 29 U.S.C.A. § 159(a) and (b). In Pittsburgh Plate Glass Co. v. National Labor Relations Board, 313 U.S. 146, 152, 61 S.Ct. 908, 912, 85 L.Ed. 1251, the Supreme Court by Mr. Justice Reed said, "The Labor Act places upon the Board the responsibility of determining the appropriate group of employees for the bargaining unit. In accordance with this delegation of authority, the Board may decide that all employees of a single employer form the most suitable unit for the selection of collective bargaining representatives, or the Board may decide that the workers in any craft or plant or subdivision thereof are more appropriate." We do not doubt (as the petitioner insists and as the record shows) that the work of the foundrymen and the other employees at the Exeter Shop is performed solely for the purpose of aiding other employees of Glen Alden, in particular the miners, to mine and prepare coal for shipment, but this is beside the point. The foundrymen are clearly within the classifications referred to in the last clause of the last sentence of Mr. Justice Reed's opinion which we have quoted. They are workers in a particular craft whose labors are carried on at a plant which is a subdivision of Glen Alden's extensive properties. As was said in the Delaware-New Jersey Ferry Company case, supra, the selection of the bargaining unit is clearly a matter for the specialized experience and expert knowledge of the Board and accordingly its decision in its administrative field is entitled to great weight.

■ A preponderant majority of the employees who work in the foundry have indicated an unmistakable intention that they should be represented for the purposes of collective bargaining by the Molders Union. While it is true, as Glen Alden points out, that if the Board's conclusion that the foundry employees constitute an appropriate bargaining unit is sustained, there will be a small island of some fifty employees represented by an AFL union in the midst of some 14,000 other employees represented by the United Mine Workers, this is beside the point. The foundrymen are entitled to collective bargaining representatives of their own choosing as provided in Section 7 of the Act, 29 U.S.C.A. § 157. We cannot conclude that the Board abused its discretion in its choice of an appropriate collective bargaining unit.

■ The refusal of Glen Alden to bargain collectively with the Molders Union acting on behalf of the foundrymen is apparent. Indeed, Glen Alden admits it, stating candidly that it may not bargain with the Molders Union because its contracts with the United Mine Workers prohibit such a course. Under these circumstances an unfair labor practice as defined by Section 8(5) of the Act, 29 U.S.C.A. § 158(5), is clearly demonstrated and the Board's finding in this respect is supported by adequate evidence.

A further question remains to be disposed of however. Glen Alden contends that as a result of the taking over of its mines and facilities by the Secretary of the Interior, it has no power to comply with the order of the Board and in fact cannot comply with the Board's order until its mines and other properties are returned to

it. A résumé of the pertinent facts is necessary.

The President of the United States, acting pursuant to authority vested in him by the Constitution and laws of the United States, in particular the War Labor Disputes Act,[4] by the Executive Order of November 1, 1943, No. 9393, authorized and directed the Secretary of the Interior "* * * to take immediate possession, so far as may be necessary or desirable, of any and all mines producing coal in which a strike or stoppage has occurred or is threatened, * * * and to operate or arrange for the operation of such mines in such manner as he deems necessary for the successful prosecution of the war, and to do all things necessary for or incidental to the production, sale and distribution of coal."

The Executive Order goes on to provide, "The Secretary of the Interior is authorized and directed to maintain customary working conditions in the mines and customary procedure for the adjustment of workers' grievances. He shall recognize the right of the workers to continue their membership in any labor organization, *to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection,*[5] provided that such concerted activities do not interfere with the operation of the mines.

"The Secretary of the Interior is further authorized and directed to offer to the duly constituted representatives of the workers' own choosing a contract or contracts governing the terms and conditions of employ-ment for the period of the operations of the mines by the government, in accordance with the opinion of the National War Labor Board in the matter of Illinois Coal Operators Association and United Mine Workers of America of October 26, 1943, and with such further directives as may be given by the War Labor Board. When any such contract has been agreed upon, the Secretary of the Interior shall apply under section 5 of the War Labor Disputes Act to the National War Labor Board for the approval of such contract and such changes in the terms and conditions of employment as may be authorized therein."[6]

■ On November 1, 1943 the Secretary of the Interior took possession of the coal mines, including the properties of Glen Alden, by virtue of the authority vested in him by the President of the United States by the Executive Order of November 1, 1943. Upon November 2, 1943 the Secretary of the Interior issued a directive designating the presidents of the respective mining companies as "Operating Manager for the United States" for each and all of the mines. The directive states, inter alia, "The Regulations for the Operation of Coal Mines Under Government Control, as amended (8 F.R. 6655, * * *) which I have issued heretofore, will be applicable to the present period of Government possession, and operation of your mines should be conducted in accordance with the provisions of those Regulations." The Regulations for the Operation of Coal Mines Under Government Control promulgated by the Secretary of the Interior at 8 F.R. 6655 are particularly pertinent.[7] Section 24 ex-

[4] War Labor Disputes Act, c. 144, Public Law 89, 1st Sess. 78th Congress, 50 U.S.C.A.Appendix, § 1501 et seq. See United States Code Congressional Service, 1943, No. 4, 162 et seq.

[5] It will be observed that the words which we have italicized are identical with those of Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157.

[6] See United States Code Congressional Service, 1943, No. 7, 5-90 et seq.

[7] These Regulations provide in part as follows:

"Section 23(b) *Collective bargaining.* In accordance with the terms of Executive Order No. 9340, the customary machinery for the adjustment of workers' grievances shall be maintained in all mines and the right of the workers shall be recognized to continue their membership in any labor organization, to bargain collectively through representatives of their own choosing, and to engage in collective activities for the purpose of collective bargaining or other mutual aid or protection, provided that such concerted activities do not interfere with the operation of the mine."

Section 24 provides:

"Application of Federal and State Laws. (a) The mining companies, their personnel and their property are deemed to remain subject during the period of Government control to all Federal and State laws and to actions, orders, and proceedings of all Federal and State courts and administrative agencies. The companies are expected to meet all Federal, State and local taxes, contributions, and assessments in the customary manner."

Section 17 of the Regulations provides that Operating Managers shall perform for their companies ordinary duties of

pressly provides that all Federal as well as all State laws are to remain applicable to the mining companies, their personnel and their properties, as well as the actions, orders and proceedings of the Federal and State courts and administrative agencies. It is clear that the workers employed by the mining companies possess the right to bargain collectively and to engage in collective activities provided that these do not interfere with the operation of the mine. Note the provisions of the Executive Order of November 1, 1943 which we have italicized. It is incumbent upon the Secretary of the Interior to decide whether these concerted activities by the workers in the mines will interfere with operation. The determination of this issue lies within the sound administrative discretion of the Secretary of the Interior under the regulations which he himself has promulgated. It is pertinent to note, therefore, that on November 22, 1943 the Secretary of the Interior wrote to Chairman Millis of the

National Labor Relations Board in response to a letter written by Chairman Millis to him in respect to the proceedings now pending before us. Chairman Millis had directed his inquiry to the specific questions as to whether Glen Alden still possesses the right or duty to comply with the order of the Board and whether the Board still has jurisdiction of the controversy.[8] Secretary Ickes, quoting the regulations heretofore quoted or referred to in this opinion, stated that despite the fact that the Government had taken possession of the mining properties, Glen Alden Coal Company remained subject to the orders of the National Labor Relations Board. This is a determination by the Administrator of the extent to which he has exercised the power conferred upon him by the President. Under the circumstances of the case at bar this determination is binding upon us.[9]

A decree will be entered enforcing the order of the Board.

management in accordance with established policies and practices so far as consistent with the regulations and instructions of the Administrator.

[8] Secretary Ickes in his letter stated in part:

"In your [Chairman Millis's] letter of November 18 you state that in proceedings now pending before the United States Circuit Court of Appeals for the Third Circuit to enforce an order of your Board requiring the company to bargain collectively with the certified union at its Exeter shop, Glen Alden Coal Company has requested a stay of enforcement on the ground that while the property is in the possession of the Government, the Government has no power or authority to comply with the order of the National Labor Relations Board and the Board has no jurisdiction over the matter. You request a statement as to my position with respect to the company's request."

Referring then to sections of Regulations which we have quoted, Secretary Ickes stated:

"Accordingly, despite the fact that the Government has taken possession of the mining properties, Glen Alden Coal Company remains subject to the orders of the National Labor Relations Board. I have at no time indicated that I would have any objection to compliance by the

company or the Operating Manager with the Board's order."

[9] We point out that the facts presented to the Supreme Court in the case of Missouri Pacific R. Co. v. Ault, 256 U. S. 554, 557, 41 S.Ct. 593, 595, 65 L.Ed. 1087, cited by Glen Alden, are in nowise analogous to those of the case at bar. As Mr. Justice Brandeis stated: "By the establishment of the Railroad Administration and subsequent orders of the Director General, the carrier companies were completely separated from the control and management of their systems. Managing officials were 'required to sever their relations with the particular companies and to become exclusive representatives of the United States Railroad Administration'. * * * The railway employees were under its direction and were in no way controlled by their former employers." In the case of the mines, the right of the workers to bargain collectively through representatives of their own choosing specifically has been preserved and the Operating Managers are empowered to serve as agents of their companies " * * * with respect to all actions which they would have been empowered to take on behalf of * * * [those companies] in the absence of Government control of * * * [their] properties."