**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WEYERHAEUSER COMPANY, a Corporation, as successor to the Ace Folding Box Corporation, Respondent.**

**No. 12793.**

United States Court of Appeals
Seventh Circuit.

April 6, 1960.

Rehearing Denied May 4, 1960.

Thomas J. McDermott, Associate Gen. Counsel, Melvin J. Welles, Atty., Stuart Rothman, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Alfred Avins, Atty., N. L. R. B., Washington, D. C. for petitioner.

Thomas R. McMillen, Chicago, Ill., James B. Moran, Chicago, Ill., for respondent. Bell, Boyd, Marshall & Lloyd, Chicago, Ill., of counsel.

Benjamin M. Robinson, New York City, Gen. Counsel, Matthew Silverman, New York City, Atty., Amalgamated Lithographers of America, New York City, for Amalgamated Lithographers of America, Amicus Curiae in Support of Petition.

Before HASTINGS, Chief Judge, SCHNACKENBERG and CASTLE, Circuit Judges.

HASTINGS, Chief Judge.

This is a case of first impression before a Court of Appeals testing the appropriateness of a collective bargaining unit composed of lithographic press employees in the paper box industry, a case in which a craft unit was severed from an existing certified industrial union.

It comes before us on the petition of the National Labor Relations Board (Board) pursuant to the provisions of Section 10(e) of the National Labor Relations Act (the Act). 29 U.S.C.A. § 160(e). The Board prays for enforcement of its order issued against Ace Folding Box Corporation requiring that it cease and desist from its refusal to bargain with the duly certified representative of certain employees, the Amalgamated Lithographers of America, AFL-CIO (Lithographers). Subsequent to the Board's issuance of the order, Ace Folding Box Corporation was merged into the Weyerhaeuser Company and dissolved. By order of court, Weyerhaeuser Company presently is the proper respondent. The court denied Lithographers' motion to intervene in this proceeding but granted its alternative request to file a brief *amicus curiae*.

The chronology of this dispute follows: On February 23, 1958, Lithographers filed a representation petition for a separate craft unit pursuant to Section 9(c) of the Act, 29 U.S.C.A. § 159(c), in which it requested certification as the bargaining representative of all lithographic production employees at respondent's plant in Middlebury, Indiana. At the time the petition was filed, all hourly employees in respondent's plant were represented by the United Paperworkers of America, Local 10181 AFL-CIO (Paperworkers). This certified industrial unit included, among others, letterpress employees, offset press employees, ink mixers and storekeepers, cutting pressmen, glue machine operators, die makers, and maintenance and repair workers. Paperworkers was permitted to intervene in the representation proceeding by virtue of its contract.

The Board found a lithographic craft unit appropriate and defined its scope to include all pressmen, apprentice pressmen, feeders, helpers, and floormen engaged in offset (lithographic) work at

respondent's plant, excluding all other employees and supervisors as defined in the Act. The Board directed that an election be conducted among the designated employees.[1]

Both respondent and Paperworkers petitioned for reconsideration of the decision, but the Board denied the request. The Board did, however, specifically amend its short-form election specification. It found that in these circumstances either the craft (Lithographers) or the industrial (Paperworkers) unit was appropriate and ordered certification of the union which would receive a majority of votes to be cast.

On July 3, 1958, seventeen eligible employees voted on ballots that gave two choices—representation by Lithographers or by Paperworkers. Twelve employees voted for Lithographers; four, for Paperworkers; and one ballot was void. Consistent with the election results, on July 14, 1958, the Board certified Lithographers as the collective bargaining representative of the lithographic production employees.

Lithographers requested a bargaining conference with respondent on July 22, 1958; respondent has declined to bargain. Upon Lithographers' charge of refusal to bargain, the Board issued an unfair labor practice complaint on November 18, 1958.

At the hearing on the complaint before the trial examiner, the Board, respondent, and Lithographers appeared; Paperworkers was permitted to intervene. Subsequently, the Board adopted the trial examiner's intermediate report which found that respondent had violated Section 8(a) (5) and (1) of the Act, 29 U.S.C.A. § 158(a) (1, 5) by its refusal to bargain with Lithographers. Accordingly, the Board directed respondent to cease and desist from its unfair labor practices, to bargain with Lithographers upon request, and to post appropriate notices. 124 NLRB No. 9 (1959). It is the enforcement of this order that the Board requests.

Respondent's opposition to the enforcement of the order is based on four contentions: (1) the Board's determination that the bargaining unit in question was appropriate constituted arbitrary action and was not supported by substantial evidence; (2) the Board's election procedure was improper inasmuch as (a) it allowed the employees to determine the appropriate unit and (b) the representation ballot offered employees no opportunity to vote "no union"; (3) the Board erred in refusing to consider the effect of Lithographers' disaffiliation from the AFL-CIO after its certification; (4) the Board erred in refusing to consider the effect of Lithographers' alleged violation of the AFL-CIO no-raiding agreement.

1. The unreported short-form decision of the Board, Case 13–RC–5879, to split off a craft unit of lithographic production employees from the existing industrial union was rationalized in this footnote finding:

"[Lithographers] seeks to sever the [requested] unit of all employees engaged in the offset process from the plantwide unit currently represented by [Paperworkers]. [Paperworkers] contends primarily that no election should be directed; alternatively that severance should include letterpress as well as offset employees. [Respondent] opposes severance and also urges that [Lithographers] has not established that the employees it seeks constitute a true craft unit.

"The employees sought by [Lithographers] are engaged in the operation of offset presses which use the traditional and customary lithographic processes. Although they have in some instances transferred to offset work from other parts of the plant there is not such regular and continuous interchange as would preclude their separate representation or dictate a combined letterpress and offset unit. Cf. Pacific Press, Inc., 66 NLRB 458. We find that these employees, may, therefore, constitute a separate appropriate unit, and that there is no such integration of [respondent's] operations as would preclude their separate representation. McCall Corporation, 118 NLRB 1332. As [Lithographers] is a union which traditionally represents such employees, we shall direct an election in the unit it seeks."

Upon examination, we hold that each of respondent's contentions cannot be sustained and that we should enter a decree enforcing the Board's order in full.

## I

■ With reference to respondent's challenge to the appropriateness of the bargaining unit, it is axiomatic that the Board has wide discretion in establishing the correct limits of a bargaining unit. The Board's act of "informed discretion" is based on the particular facts of each case and will be reversed only when there is a capricious and arbitrary exercise of such discretion. We must affirm the Board's factual findings when they are supported by substantial evidence on the record considered as a whole. 29 U.S.C.A. § 160(e). Packard Motor Car Co. v. National Labor Relations Board, 1947, 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040; International Union, United Auto, Aircraft and Agr. Implement Workers of America v. National Labor Relations Board, 7 Cir., 1956, 231 F.2d 237, 243; National Labor Relations Board v. Esquire, Inc., 7 Cir., 1955, 222 F.2d 253, 256; Allis-Chalmers Mfg. Co. v. National Labor Relations Board, 7 Cir., 1947, 162 F.2d 435, 439; Valley Mould & Iron Corp. v. National Labor Relations Board, 7 Cir., 1940, 116 F.2d 760, 764, certiorari denied 313 U.S. 590, 61 S.Ct. 1114, 85 L.Ed. 1545.

The standards limiting our review apply equally to the Board's original designation of the appropriate bargaining unit (Paperworkers) and to the subsequent situation, as here, where it must determine whether to carve out an appropriate craft unit from an existing industrial unit. The only restriction in the Act itself is the mandate that the Board cannot refuse to sever a craft unit from the existing industrial unit solely on the ground that a different bargaining unit has been established in a prior Board determination. See Section 9(b)(2) of the Act, 29 U.S.C.A. § 159(b)(2).

■ A résumé of the facts before us indicates that the Board did not act arbitrarily in its severance of a craft unit composed of eighteen lithographic production employees. Respondent is engaged in the manufacture of folding paper boxes. Its production run generally involves printing, cutting, and gluing the raw material, known as paper board. After processing, the empty paper boxes are folded flat, packed and shipped out in such folded condition. Prior to 1956, respondent carried on these activities in a plant in White Pidgeon, Michigan, in which the printing was done solely by letterpress. Late in 1954, the Board ordered a representation election held in that plant; and subsequently, Paperworkers was certified as the bargaining agent for all eligible employees.

In 1956, respondent moved into a new single-floor plant in Middlebury, Indiana. In this plant it installed four letterpresses and added a five color offset (lithographic) press. At the time of the representation hearing respondent was preparing to install a second offset press.

Essentially, a letterpress operation produces the printed impression by pressing an unprinted sheet against a raised, inked surface; it is often described as a "mechanical" operation. "The lithographic process is distinguishable from letterpress printing in that it involves printing from a plane surface and depends for its operations upon a chemical difference between various portions of the surface of the plate used in making the impression. Each step in the process is separate and distinct from that of letterpress." Fey Publishing Company, 108 NLRB 1031, 1032 (1954). The record discloses testimony that the lithographic method of reproduction is used not only on paper but also in metal decorating and toy industries, in the plastic industry and in the textile industry to decorate cloth.

Respondent employed 100 to 110 hourly employees and 30 to 35 salaried employees in two shifts. Fifteen to twenty employees worked on the letterpresses. Of the remaining hourly employees, Lithographers requested a craft unit composed of "all lithographic production

employees." It claimed that at least twelve employees should be included in the unit (two five-color pressmen, two second pressmen, two five-color apprentices, two five-color feeders, and four five-color helpers). It also left to the discretion of the Board the question of whether six floormen should be included in the craft unit; ultimately, the Board included the floormen in the unit.

Before the hearing officer respondent attempted to present a pattern of total integration within its plant. However, there was substantial countervailing testimony which supports the Board's conclusion that a separate unit is appropriate: the nature of the work engaged in by the individuals in the unit; the minimal interchange of personnel between the letterpress and offset crews; the separate foremen on the day shift; the original employees on the offset crew were largely hired outside the plant, many with prior lithographic experience; the original five offset pressmen were given a two-month period of training in Chicago; promotions in the offset group were initially considered from within that group before general bidding from the plant as a whole; and the wage pattern of the offset unit was separate from and higher than that of the comparable letterpress crew. Further, there was undisputed testimony that respondent's offset press was of the usual type and that the skills to operate it were those normally associated with lithographic employees.

It would serve no purpose more minutely to describe the production process in respondent's plant. It is sufficient to say that a careful reading of the record before us supports the determination of the Board in this case. The unit is appropriate.

The result we reach in this case of first impression is consistent with the long-established practice of the Board in recognizing the particular skills possessed by lithographic employees. Lithographers cites in its brief more than 150 cases over a course of sixteen years in which a unit limited to lithographic employees was held appropriate. However, in the proper case, the Board has refused separate representation for lithographic employees. Cf. Pacific Press, Inc., 66 NLRB 458 (1946), in which a single crew regularly and continuously worked on both letterpresses and offset presses.

The parties have cited three reported cases involving lithographers who requested craft bargaining status in the folding box industry. Sutherland Paper Company, 122 NLRB 1284 (1959); Harvey Paper Products Company, 116 NLRB 1624, 1626 (1956); and Pacific Coast Association of Pulp and Paper Mfrs., 94 NLRB 477 (1951). In each of these cases the Board held appropriate either the industrial or craft unit and ordered employees to vote on their preference. However, as distinguished from the facts before us, the employees there voted for the industrial unit.

Respondent has argued that the present case must be considered in the light of the American Potash and National Tube doctrines. Briefly, these cases (National Tube Company, 76 NLRB 1199 (1948) and American Potash & Chemical Corporation, 107 NLRB 1418 (1954) ) illustrate the shifting policy of the Board toward the standards of craft unit severance in integrated industries previously represented by industrial unions. The recent case of N. L. R. B. v. Pittsburgh Plate Glass Co., 4 Cir., 1959, 270 F.2d 167, certiorari denied, 1960, 361 U.S. 943, 80 S.Ct. 407, 4 L.Ed.2d 363, held that this change of standards and its application constituted arbitrary and unlawful action on the part of the Board.[2] Respondent contends that the

---

2. In National Labor Relations Board v. Libbey-Owens-Ford Co., 4 Cir., 1957, 241 F.2d 831, the same court held that in a similar case where the Board expressly based its decision on grounds other than the criteria of the rule enunciated in the American Potash case, it was not appropriate for that court to enter into a discussion of the rule. In the instant case the Board did not rely on the American Potash rule.

Board's action here is based on the principles of the American Potash doctrine and, as such, must fall as arbitrary action.

The direct answer to respondent's argument is that National Tube, American Potash and Pittsburgh Plate Glass involved industries *found to be integrated* and set applicable standards for severing a craft unit within such industries which had existing industrial unions and a long pattern of industrial bargaining. Here, the key finding of the Board, for which we found substantial support, supra, is that respondent's plant is *not* integrated. The Board found that "there is no such integration of the Employer's operation as would preclude their separate representation." Further, it is significant to note that prior to American Potash the Board had determined that the degree of integration within the paper and pulp industry and within the paper carton industry was not sufficient to make the National Tube doctrine applicable. See, Pacific Coast Association of Pulp and Paper Mfrs., 94 NLRB 477, 480 (1951).

■ In addition respondent has orally argued that the craft unit is inappropriate because of the potentiality of increased economic friction within its plant. It foresees one union demanding a thirty-five hour week while the other bargains for a forty hour week, separate grievance procedures and seniority provisions, and distinct wage patterns. However, the economic consequences that flow from negotiations at the bargaining table cannot be controlling in establishing an appropriate bargaining unit.

Having considered the record before us which discloses the factual setting of respondent's manufacturing operations, the long history of the Board's recognition of the cohesiveness of the bargaining interests of lithographers, the reasonable standards by which the Board exercised its "informed discretion," and our limited function in reviewing the establishment of an appropriate bargaining unit, we cannot say that the Board's action was arbitrary or lacked substantial evidentiary support.

II

■ Respondent further challenges the election procedure of the Board. Its first complaint is that the Board abdicated its function and allowed the employees to select the appropriate bargaining unit in violation of the statutory mandate that the Board "shall decide in each case whether * * * the unit appropriate * * * shall be * * * [a] craft unit * * *." 29 U.S.C.A. § 159(b). This delegation of its function was accomplished, it is alleged, because the Board conducted a self-determination ("Globe") election in which the employees in question voted either for Lithographers or for Paperworkers as their bargaining representative. Since a majority picked Lithographers, that union was certified as the proper bargaining agent.

Respondent relies on a case from this circuit to sustain its position. In Marshall Field & Co. v. National Labor Relations Board, 7 Cir., 1943, 135 F.2d 391, a divided court held that the Board unlawfully delegated its proper function of selecting the appropriate bargaining unit to the employees. There, the Board held that the employees under consideration "might together constitute a separate bargaining unit or they might appropriately be included as part of a [larger] unit [and] * * * that the determining factor should be the desires of the employees themselves [as measured in a representation election]." The court found error because of the "failure of the Board to designate the unit *before* holding the election." 135 F.2d at page 393.

Respondent originally argued this point in its Petition for Reconsideration of the Board's Decision and Direction of Election of June 5, 1958. Thereafter, on June 23, 1958, in an Order denying the Petition for Reconsideration, the Board amended its findings to hold expressly that the craft unit in question here was appropriate. Since the techni-

cal flaw present in the Marshall Field case does not exist here, that case does not control. Indeed, the majority in Marshall Field remanded the case to the Board with directions to proceed by *first* establishing the unit and subsequently conducting an election, if necessary. This is the precise procedure the Board ultimately adopted and followed in the case at bar.

■ However, this decision need not turn on such narrow grounds. The Board has broad powers to conduct representation elections. National Labor Relations Board v. A. J. Tower Co., 1946, 329 U.S. 324, 330–331, 67 S.Ct. 324, 91 L.Ed. 322; Southern S.S. Co. v. National Labor Relations Board, 1942, 316 U.S. 31, 37, 62 S.Ct. 886, 86 L.Ed. 1246; National Labor Relations Board v. Falk Corp., 1940, 308 U.S. 453, 458, 60 S.Ct. 307, 84 L.Ed. 396. Globe elections have been conducted by the Board since 1937. The Globe Machine and Stamping Co., 3 NLRB 294 (1937). See also, Otis Elevator Co., 108 NLRB 1351 (1954); Phillips Petroleum Company, 107 NLRB 1207 (1954); Duval Sulphur and Potash Company, 107 NLRB 1002 (1954); Art Metal Construction Company, 75 NLRB 80 (1947). Such elections have been recognized by the courts, although in only one case has the procedure itself been challenged. In National Labor Relations Board v. Underwood Machinery Co., 1 Cir., 1949, 179 F.2d 118, the court approved the election and distinguished Marshall Field factually (since the Board had expressly found the unit in question appropriate) but on more broad grounds found the dissenting opinion of Judge Minton in Marshall Field to be "persuasive." Later cases in which Globe elections appear unchallenged include National Labor Relations Board v. Grace Co., 8 Cir., 1950, 184 F.2d 126; Mueller Brass Co. v. National Labor Relations Board, 1950, 86 U.S.App.D.C. 153, 180 F.2d 402, 404; Glen Alden Coal Co. v. National Labor Relations Board, 3 Cir., 1944, 141 F.2d 47.

The Supreme Court has held that the wishes of the employees are one factor in the Board's exercise of its discretion in establishing an appropriate unit. Pittsburgh Plate Glass Co. v. National Labor Relations Board, 1941, 313 U.S. 146, 156, 61 S.Ct. 908, 85 L.Ed. 1251. Section 9 (b) (2) of the Act recognizes that self-determination elections are an integral part of craft severance cases. We hold that the Board has sufficient power to order a self-determination election.

■ As part of its challenge of the election procedures, respondent states that the ballot provided no opportunity for the employees to vote "no union." The exclusion of this choice, respondent argues, is a violation of the employee's rights under Section 7 of the Act to refrain from union activity.

Prior to 1956, consistent with general Globe election practice, the Board included a "no-union" choice on its craft severance ballot. But it discontinued this procedure in American Tobacco Company, Incorporated, 115 NLRB 218 (1956). There the Board stated that "[n]othing in the Act or its legislative history * * * expressly or impliedly requires that employees in a craft severance election be afforded an opportunity to return to nonunion status." 115 NLRB at 220. Indeed, a "no-union" choice in a craft severance election would be an indirect proceeding for partial decertification. Cf. Campbell Soup Company, 111 NLRB 234 (1955). The Board's balloting procedure here did not deny the employees any rights accruing to them because of the general provisions of Section 7 of the Act, 29 U.S.C.A. § 157.

■ Further, respondent charges that because of the existence of the Indiana "right-to-work law," Burns' Ind. Stat.Ann. §§ 40–2701 to 40–2703 (1952 Repl.Supp.), employee rights are curtailed in some undefined way. We do not agree.

Election and certification merely designate the union, pursuant to the choice registered by a majority of the employees who voted, as the representative for collective bargaining purposes.

Such election does not compel any employee to join any union. We find no conflict with the Indiana statute. There was no error in the hearing officer's refusal to admit evidence concerning the Indiana right-to-work law.

### III

■ Respondent's third major challenge to the enforcement of the Board's order to bargain is that the Board in the unfair labor practice proceeding refused to consider the effect of Lithographers' disaffiliation from the AFL-CIO, which raises doubt as to Lithographers' identity—that is, whether it is the same organization as that selected and certified. At the time of the representation election, certification, and the request and the refusal to bargain, Lithographers was affiliated with the AFL-CIO. Subsequently, on August 21, 1958, Lithographers disaffiliated from the AFL-CIO. In these circumstances, disaffiliation is not relevant to the question of appropriateness of the unit, but goes directly to the question of whether respondent has refused to bargain with the certified representative.

Respondent made two offers of proof before the trial examiner, who rejected both. The first had to do with the mechanics of disaffiliation, shown by the AFL-CIO constitution. The Board properly rejected this offer since it was not evidence of "probative value" to prove a change in the organic structure, composition, or leadership of a labor organization, necessary elements in the proof of a change of identity of a labor union. A mere change of name or disaffiliation with the AFL-CIO is not sufficient. Union Carbide & Carbon Corp. v. National Labor Relations Board, 6 Cir., 1957, 244 F.2d 672, 673; Carpinteria Lemon Ass'n v. National Labor Relations Board, 9 Cir., 1956, 240 F.2d 554, 557; National

Labor Relations Board v. Harris-Woodson Co., 4 Cir., 1950, 179 F.2d 720, 723; Continental Oil Co. v. National Labor Relations Board, 10 Cir., 1940, 113 F.2d 473, 477.

Respondent's second offer of proof was oral testimony as to the possible effect of disaffiliation on the outcome of the representation election. This is not evidence of a change in identity, but is an apparent effort to relitigate the question of what constitutes an appropriate unit. Under the circumstances of this case, the Board held that such evidence should have been presented in a petition to reconsider the determination of the appropriate unit. We find no error in the Board's holdings.

### IV

■ Respondent's final challenge to the enforcement of the Board's order is that the Board erred in refusing to consider the defense that Lithographers, in filing its representation petition, violated the "no-raiding" provision of the AFL-CIO constitution to which Lithographers and Paperworkers had subscribed.[3]

It appears from the record that this issue was first raised in the representation hearing when Paperworkers moved for a stay pending the processing of a formal complaint to the president of the AFL-CIO charging Lithographers with a violation of the no-raiding provision. This stay was denied by the hearing officer, and the Board made no reference to it in ordering the election.

This issue was next raised in the unfair practice proceeding after Paperworkers was permitted to intervene. Respondent pleaded it as an affirmative defense. Paperworkers was joined by respondent in certain offers of proof which were denied by the trial examiner. The Board sustained the trial examiner.

3. Article III, Sec. 4 of the AFL-CIO Constitution provides that " * * * no affiliate shall raid the established collective bargaining relationship of any other affiliate." In addition it set up a procedure for settling and arbitrating disputes. Lithographers and Paperworkers subscribed to these provisions by approving and joining in the merger of the AFL and the CIO.

For history and text of no-raiding agreement, see 2 CCH Lab.L.Rep. ¶ 5230.95 et seq.

The Board contends that *respondent* cannot now raise this issue since it was neither a party to nor a third party beneficiary of the no-raiding agreement. However, as we have pointed out, this issue was before the Board at every stage of this proceeding. The Board refused to consider or give effect to the alleged violation of the no-raiding agreement as a defense to the refusal to bargain. We think this refusal by the Board is properly before us for review in this case and should not be rejected on technical procedural grounds.[4]

 The Board then argues, in the alternative, that it was not required to give controlling effect to the no-raiding agreement between the two unions in this case and that it properly directed an election to ascertain the desires of the lithographic employees here involved as to separate representation by Lithographers. This is consistent with its established policy against considering such agreements.

In many cases the Board has refused to dismiss representation petitions upon a showing that they were filed in violation of no-raiding agreements.[5] But, it has recognized situations in which it will permit the withdrawal of such a petition.[6] As stated in its brief, the Board's position is that the rights to organize and to choose a bargaining representative which accrue to employees by Section 7 of the Act cannot be diminished or circumscribed by private inter-union no-raid agreements. In the Board's view, although these agreements attain the beneficial goal of promoting industrial stability, they do so only at the price of sacrificing employees' freedom to choose a bargaining representative. Industrial stability here must be subrogated, the Board contends, because only in that way may employees have the right to rid themselves of inefficient and corrupt unions. No-raiding agreements bring stability, but only by preserving the status quo and the monopoly power of the incumbent union. On balance, the Board has held that the employee rights guaranteed by Section 7 are of primary importance. Research discloses no appellate case which has ruled directly on the propriety of this decision.

In United Textile Workers v. Textile Workers Union, 7 Cir., 1958, 258 F.2d 743, we held that Section 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185, provides a forum in a federal district court wherein an action may be brought by one of the union signatories to a private no-raiding agreement between unions to compel observance thereof by the other signatory.[7] The complaining union sought equitable relief to

---

4. General language quoted by the Board from National Labor Relations Board v. National Mineral Co., 7 Cir., 1943, 134 F.2d 424, 429, and National Labor Relations Board v. Sanson Hosiery Mills, 5 Cir., 1952, 195 F.2d 350, 352, in support of its contention is taken out of context. Those cases are readily distinguishable from the case at bar.

5. Typical of such cases are E. W. Coslett & Sons, 122 NLRB 961 (1959); The Steck Company, 122 NLRB 12, 13 (1958); The Borden Company, 120 NLRB 1447 (1958); American Potash & Chemical Corporation, 117 NLRB 1508, n. 1 (1957); F. C. Russell Company, 116 NLRB 1015, 1016 (1956); Minneapolis Star and Tribune Company, 115 NLRB 1300, 1301, n. 4 (1956); North American Aviation, Inc., 115 NLRB 1090, 1091, n. 3 (1956); La Pointe Machine Tool Company, 109 NLRB 514, 516, n.

6 (1954); Los Angeles Period Furniture Co., 43 NLRB 327, 329 (1942); The Texas Company, 4 NLRB 182, 185 (1937). For a history of Board's policy toward organizational raids and no-raiding pacts, see text and collection of cases, 1 CCH Lab.L.Rep. ¶ 2735.

6. See, Personal Products Corporation, 122 NLRB 563 (1958). Cf. Great Lakes Industries, Inc., 124 NLRB No. 50 (1959), reported in 5 CCH Lab.L.Rep. ¶ 50,185, ¶ 56,562 and ¶ 56,779. See also, Note, "N.L.R.B. Representation Procedure," 28 U.Cinc.L.Rev. 532 (1959).

7. Followed in Local 2608, Lumber and Sawmill Workers Etc. v. Millmen's Local 1495, Etc., D.C.N.D.Cal.1958, 169 F. Supp. 765. Contra, International Union, of Doll & Toyworkers Etc. v. Metal Polishers, Etc., Union, D.C.S.D.Cal.1960, 180 F.Supp. 280.

enforce the findings of an impartial umpire appointed under the provisions of the AFL-CIO no-raiding agreement. The umpire found the agreement had been violated. This court affirmed an order of the district court directing the violating union to withdraw a representation petition from the Board. The Board had previously rejected the incumbent union's contention regarding the effect of the no-raiding agreement and had directed an election, but such election had not been held. Thereafter, the Board permitted withdrawal of the petition, but stated it did not acquiesce in this court's decision and that it would not, in the future, permit withdrawal unless the Board was made a party to court litigation so that it might express its views. Personal Products Corporation, 122 NLRB 563 (1958). Our holding in United Textile Workers gives effect to a *contract right* arising from a no-raiding agreement in a Section 301 proceeding in the district court.[8] It makes apparent that proceedings before the Board and judicial review under Section 10(e) of the Act are no longer the exclusive channel for deciding representation questions. Cf. Leedom v. Kyne, 1958, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210.

Unlike the situation in United Textile Workers, in the instant case there has been neither a decision by an umpire nor a suit brought in the district court under Section 301. We are concerned here with a judicial review under Section 10(e) of the Act. The Board correctly asserts that respondent and Paperworkers, by their offers of proof, were attempting to litigate the alleged no-raiding violation in a representation hearing and in the subsequent unfair practice hearing. The rights which arise under the AFL-CIO no-raiding agreement give *unions* a contractual immunity from organizational raids of competing unions. An established union which feels its rights have been violated has a forum in the district court under Section 301. In the case at bar it should be remembered that *Lithographers chose to disaffiliate* from AFL-CIO. There may be a serious question whether under these circumstances an alleged prior breach of the no-raiding agreement could now be made the subject of a Section 301 action or be asserted as a bar to the representation proceeding. Under the narrow factual situation before us, we hold that the Board did not err in adhering to its policy of refusing to consider an alleged violation of the no-raiding agreement.

The extent to which such inter-union no-raiding agreements shall encroach on the Board's established policy of disregarding them in representation hearings must be worked out in the future on a case-by-case basis. This is in harmony with the mandate of the Supreme Court in Textile Workers Union of America v. Lincoln Mills of Alabama, 1957, 353 U.S. 448, 457, 77 S.Ct. 912, 1 L.Ed.2d 972.

We do not here give blanket approval to the Board's policy of refusing to recognize no-raiding agreements. The resolution of that broader problem calls into play the balancing of two beneficial, but conflicting, policy goals. The desire for stability in labor relations is in opposition to the right of freedom of choice in bargaining representation. There will also be the need for accommodating the statutory power of the courts to enforce contractual rights on the one hand with the jurisdiction vested in the Labor Board to determine questions as to representation on the other.[9] These

---

8. For conflicting views on this decision, see, Note. "Applying the 'Contracts Between Labor Organization' Clause of Taft-Hartley Section 301: A Plea for Restraint," 69 Yale L.J. 299, 306 (1959); contra, Note, "Jurisdiction of Federal District Court to Specifically Enforce Interunion No-Raiding Agreement Upheld," 59 Colum.L.Rev. 202, 204 (1959).

9. These and related questions have been the subject of much discussion. See Cox, "Some Current Problems in Labor Law: An Appraisal," 35 L.R.R.M. 48, 57–59 (1955); Aaron, "Interunion Representation Disputes and the NLRB," 36 Texas L.Rev. 846, 851–52 (1958); Jenkins, "The Impact of Lincoln Mills on the

matters will be determined in appropriate cases.

For the reasons stated, the Board's petition for a decree enforcing its order must be granted.

Enforcement ordered.

National Labor Relations Board," 6 U.C. L.A.L.Rev. 355, 365 (1959); Summers, "Union Powers and Workers' Rights," 49 Mich.L.Rev. 805, 818 (1951); Krislov, "The No-Raiding Agreement after Five Years," 10 Lab.L.J. 861 (1959); Krislov, "Raiding Among the 'Legitimate' Unions," 8 Ind. & Lab.Rel.Rev. 19 (1954); Krislov, "Everybody's State in the No-Raiding Agreement," 5 Lab.L.J. 83 (1954).